UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SERENA THOMPSON, LINDA UNNELAND,  :
SANJA MEDICH, NAOMI  :
DECHOUDENS, and ANNIE PETRARO,  :
 :
 : Dkt. No.
                     Plaintiffs,  :
 :
        -against-  :
 :
 :
CORIZON HEALTH, INC.,  :
PHYSICIAN AFFILIATE GROUP OF  :
NEW YORK, P.C., THE NEW YORK CITY HEALTH :
& HOSPITALS CORPORATION, THE CITY  :
OF NEW YORK.  :
 :
                  Defendants.  :

-------------------------------------------------------------------x

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Serena Thompson, Linda Unneland, Sanja Medich, Naomi Dechoudens, and Annie Petraro (together, "Plaintiffs"), by and through their undersigned counsel, Giskan Solotaroff & Anderson LLP, as and for their Complaint in this action against Defendants Corizon Health, Inc. ("Corizon"), Physician Affiliate Group of New York, P.C. ("PAGNY"), the New York City Health and Hospitals Corporation ("HHC"), the City of New York ("City"), (together, "Defendants") hereby allege as follows upon information and belief:

## NATURE OF THE CLAIMS

1.     This is an action in which Plaintiffs seek recovery for injuries and to remedy unlawful sexual harassment in employment, in violation of Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York City Human Rights Law, N.Y.C. Admin. Code. § 8-107 *et seq.* ("NYCHRL"). Plaintiffs Thompson, Petraro

and Unneland also bring individual claims against Defendant Corizon for unpaid overtime wages pursuant to the New York Labor Law § 650 *et seq.* ("NYLL").

2.  Plaintiffs are all women who are and/or have been employed by Defendant Corizon, and/or Defendant PAGNY as health services professionals at Rikers Island. Plaintiffs were at all relevant times also jointly employed by Defendant New York City and/or Defendant HHC.

3.  As a regular part of their duties, Plaintiffs were required to work with and around inmates in the custody of the City's Department of Correction ("DOC") Plaintiffs were regularly subjected to severe, pervasive, and unwelcome sexual harassment by inmates, including but not limited to exhibitionist masturbation and being sprayed by semen, urine and other bodily fluids.

4.  On an almost daily basis Plaintiffs lodged complaints with their supervisors about their severe and pervasive sexually hostile work environment. But Defendants failed to take prompt and reasonable corrective action, fostering the sexual harassment and violating Title VII and the NYCHRL. Moreover, Defendants retaliated against Plaintiffs for their complaints in violation of Title VII and the NYCHRL.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the claims of Plaintiffs Thompson, Unneland, Petraro, and Medich under Title VII pursuant to 28 U.S.C. § 1331 and § 1343. Plaintiffs Thompson, Unneland, Petraro, and Medich filed complaints with the Equal Employment Opportunity Commission ("EEOC") on the following dates:

| | |
|---|---|
| Thompson | July 12, 2016 |
| Unneland | July 9, 2016 |
| Petraro | July 12, 2016 |

Medich          July 8, 2016

6.      Beginning on May 9, 2018, the EEOC issued right to sue letters, attached hereto as Exhibit A.

7.      Supplemental jurisdiction over Plaintiffs' claims alleging violations of the NYCHRL and the NYLL exists pursuant to 28 U.S.C. § 1367(a).

8.      Pursuant to § 8-502(c) of the Administrative Code of the City of New York, a copy of this Complaint has or will, within 10 days of filing, be served upon the New York City Commission on Human Rights and the Corporation Counsel, Law Department of the City of New York.

9.      Venue is found within this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3) as the unlawful employment practice is alleged to have been committed in this District. Venue is also proper under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## **PARTIES**

10.     Plaintiff Serena Thompson is a Licensed Clinical Social Worker who resides in Middlesex County, New Jersey.

11.     Plaintiff Linda Unneland is a Licensed Clinical Social Worker who resides in Westchester County, New York.

12.     Plaintiff Sanja Medich is a Licensed Mental Health Counselor who resides in New York, New York.

13.     Plaintiff Naomi Dechoudens is a Licensed Clinical Social Worker who resides in Queens, New York.  Ms. Dechoudens was formerly known as Naomi Greenberg.

14.     Plaintiff Annie Petraro is a Licensed Mental Health Counselor who resides in Long Island, New York

15.     Defendant Corizon Health, Inc. is a Missouri corporation with its principal offices located at 105 Westpark Drive, Suite 200, Brentwood, Tennessee 37027, and its operational headquarters located at 12467 Olive Boulevard, St. Louis, Missouri 63141. Defendant Corizon is the successor to Correctional Medical Services, Inc., and was created from the merger of Correctional Medical Services and PHS Correctional Healthcare. In or about November 2012, Correctional Medical Services, Inc. or its successor in interest, Defendant Corizon, contracted with the City of New York Department of Health and Mental Hygiene ("DOHMH") to provide medical and mental health services to inmates within the custody of the DOC ("Corizon/City Contract"). Defendant City terminated Defendant Corizon's contract on January 1, 2016.  At all relevant times, Defendant Corizon was an "employer" and a "covered entity" under all applicable statutes.

16.     Defendant PAGNY is a New York corporation with its principal office located at 55 West 125th Street, New York, New York 10027. Defendant PAGNY contracted with the New York City Health and Hospitals Corporation to provide medical and mental health services to inmates within the custody of the DOC, starting January 1, 2016.  At all relevant times, PAGNY was an "employer" and a "covered entity" under all applicable statutes.

17.     Defendant HHC is a public benefit corporation created by the New York State Legislature on July 1, 1970, to operate New York City's municipal hospitals. In November 2015, Defendant HHC entered into a contract with PAGNY for the provision of comprehensive medical and mental health services staffing for inmates in the custody of the DOC ("HHC/PAGNY Contract").

18.     Defendant City of New York is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all correctional matters. In addition, at all times material herein, Defendant City was responsible for ensuring that its personnel obeyed the laws of the United States and the City of New York.

## FACTS

### *Serena Thompson*

19.     Dr. Thompson is a Licensed Clinical Social Worker who hold a Ph.D. in Social Work. Dr. Thompson worked as a mental health clinician ("MHC") at Rikers Island since September 2012 through January 2017, first for Defendant Corizon (until December 31, 2015) and then for Defendant PAGNY. Dr. Thompson is currently on workers compensation leave resulting from the trauma she suffered at Rikers Island.

20.     At all relevant times, Dr. Thompson was routinely exposed to severe and pervasive sexual harassment by inmates at Rikers Island, including but not limited to cat calls, threats of rape and other sexual violence, and exhibitionist masturbation.

21.     Dr. Thompson repeatedly informed her clinical supervisors and unit chiefs about the sexually harassing conduct she suffered. But Defendants did not take any adequate remedial measures to mitigate Dr. Thompson's sexually hostile work environment.

22.     From October 2012 until March of 2014, Dr. Thompson worked at the Restricted Housing Unit ("RHU") at Anna M. Kross Center ("AMKC") – an intensive therapeutic program for repeatedly infracting mentally ill inmates replacing 23-hour lock-in punitive segregation. In reality, however, many inmates placed in RHU were misclassified and clinically unfit for the program because they did not have severe mental health issues but instead had Antisocial

Personality Disorder and were not fit for therapy treatment. Some of them were high-ranking gang members.

23.     MHCs working at RHU were mandated to send daily emails to clinical supervisors and unit chiefs reporting all clients' behavioral incidents that happened on that day. Dr. Thompson sent such emails to Unit Chief Christina Minervini, Assistant Unit Chief Jessica Asaro, and her Clinical Supervisor Beth LaGrange *daily*. Sometimes, these emails were forwarded to Defendant New York City's Department of Health and Mental Hygiene. Despite Dr. Thompson's and other MHCs' clinical judgment, expressed in the emails and elsewhere, that some inmates were unfit for the RHU program, Defendant New York City, through its Department of Correction, would not transfer the inmates from RHU for many months (up to 8-9 months). Dr. Thompson's emails were simply ignored.

24.     At RHU, Dr. Thompson was sexually harassed by such inmates daily. They constantly made comments about her body, exposed their private parts, masturbated in front of her, and stared at her while in the shower.

25.     For example, on October 3, 2012, Dr. Thompson's second day at RHU, when she was on the unit, a patient started shaking his body and screaming her name pretending he was having an orgasm. Dr. Thompson reported this incident to Unit Chief Minervini. Dr. Thompson received no response from Corizon except Ms. Minervini telling her: "make sure you see the inmates' hands."

26.     On October 7, 2013, Dr. Thompson was held hostage by an inmate because she refused to give him her phone number. The inmate threw feces at Dr. Thompson and flooded the floor with water and feces. It continued for approximately 30 minutes until another inmate handed Dr. Thompson some plastic bags to cover her shoes and head and Dr. Thompson was

able to escape from the tier. Correction officers, who witnessed the incident, called the specially trained "probe team" only after Dr. Thompson left the unit. DOC conducted an investigation of this incident and a meeting was held on December 2, 2013, with a representative from Corizon present. At the meeting, a video recording was played that clearly showed the inmate throwing feces at Dr. Thompson. The only reaction from Corizon was to say sorry. The inmate was not held accountable for the assault.

27.     Other examples of sexual harassment at RHU, which Dr. Thompson reported to Corizon include:

- *November 14, 2012*- inmate was extremely disrespectful, yelling sexually inappropriate comments at clinicians.
- *November 19, 2012*- inmate exposed himself to clinician while in the shower.
- *November 23, 2012*- inmate exposed himself to a correction officer with sexually threatening behavior while clinician was on the unit.
- *November 26, 2012*- inmate began masturbating in front of Dr. Thompson during a cell side assessment.
- *November 29, 2012*- inmate exposed himself and masturbated in front of clinicians.
- *November 30, 2012* - inmate exposed himself to clinicians; another inmate disrobed in his cell and began masturbating in front of clinicians.
- *December 13, 2012*- while Dr. Thompson was conducting rounds, an inmate stood up on his bed completely naked. He did this again on another day and stated, "if anyone looks in my cell and I have a hard on – it's on them."
- *January 11, 2013* - inmate was extensively sexually threatening clinicians.
- *March 26, 2013*- inmate was masturbating to clinician and officer.
- *May 31, 2013* – inmate splashed Dr. Thompson with his bodily fluids.
- *June 3, 2013*- inmate was yelling at everyone to "suck his dick."
- *June 28, 2013*- inmate told clinician to "suck his dick you fucking bitch." Same inmate exposed himself to Dr. Thompson on July 2 and July 8, 2013.
- *July 9, 2013* - same inmate began a casual conversation with Dr. Thompson and then asked: "Have you ever sucked dick?"
- *July 11, 2013*- same inmate was calling Dr. Thompson from his cell during rounds and asking inappropriate questions. He also posted a sexually explicit picture on the cell window and was persistently calling clinicians to look at the picture.
- *July 15, 2013*- same inmate exposed himself to Dr. Thompson during a session.

- *July 18, 2013-* inmate refused to get out of the shower because he was masturbating while looking at Dr. Thompson providing treatment to other inmates in the dayroom.
- *July 27, 2013-* inmate called Dr. Thompson over to his cell but had nothing to say. He told Dr. Thompson he just wanted to look at her and it appeared that he was about to masturbate. Dr. Thompson asked him not to stare at her chest while she was speaking to him and that it was inappropriate, which made the inmate angry.
- *August 9, 2013-* inmate made sexually inappropriate comment to Dr. Thompson.
- *October 7, 2013* – inmate threw feces at Dr. Thompson.
- *November 12, 2013-* inmate screamed obscenities at Dr. Thompson.
- *December 2, 2013-* inmate was making sexual comments.
- *January 3, 2014-* inmate exposed himself to Dr. Thompson.
- *February 24, 2014-* inmate exposed himself to Dr. Thompson.
- *February 27, 2014-* inmate exposed himself to Dr. Thompson.
- *March 2014-* inmate who had previously harassed Dr. Thompson began masturbating during a session. When Dr. Thompson attempted to leave the room, the inmate threatened her, forcing her to remain until he finished. This inmate continued to harass Dr. Thompson until she left the RHU in April 2014.

28.     As late as December 2016, inmates were still masturbating in Dr. Thompson's presence.

29.     Based on her complaints of sexual harassment, Dr. Thompson was retaliated against by Unit Chief Minervini. On one occasion, Ms. Minnervini and her assistant Jessica Asaro pulled Dr. Thompson and MHC Janine Donovan into a room and demanded that they account for each second of their day. Ms. Minervini also demanded that Dr. Thompson and Ms. Donovan email their clinical supervisor Dr. LaGrange each time they took a break or leave the unit for any reason. This has never been required from any other MHC during Dr. Thompson's four years of employment at Rikers.

30.     Rikers inmates' sexually inappropriate behavior was not limited to RHU and Dr. Thompson has continued to experience it in other units after she stopped working at RHU.

31.     On May 8, 2014, Dr. Thompson attended a safety meeting with DOC where she requested escorts for MHCs who go into housing units to provide treatment, and if that was not possible – to have an additional correction officer present on the unit floor, because there was only one CO per 40 inmates. Dr. Thompson reiterated these concerns the same week at an AMKC C-71 meeting with Dr. Leibowitz WHO. Both DOC and Dr. Leibowitz told Dr. Thompson that this would not occur; nor did they promise or suggest any changes or solutions.

32.     On October 10, 2015, after an inmate at the 11 MOD unit had masturbated in front of Dr. Thompson for three consecutive days, Dr. Thompson informed her supervisors Kristilla Brace and Kathrine Messineo and Unit Chief Dorrell Hyde about this inmate's behavior and requested that he be transferred to another unit. On October 28, 2015, the inmate was still not removed from the unit, and Dr. Thompson sent another email repeating her request. The day before, the inmate had told Dr. Thompson: "I cannot help it if I like your silhouette. Some people may like your personality, but I admire your body." On November 2, 2015, the inmate had still not been transferred and Dr. Thompson sent another email to the supervisors and management asking to transfer the inmate. On November 6, 2015, the inmate was still on Dr. Thompson's unit and continued to masturbate in front of her.

33.     On March 29, 2016, while providing treatment to an inmate in MH unit QL4, the inmate started masturbating in front of Dr. Thompson during the session. Dr. Thompson asked him to keep his cell door open (the session was cell side), so he would not masturbate, but he continued anyway. Dr. Thompson ended the session immediately, and he closed his door and resumed masturbating while staring at her.

34.     Throughout Dr. Thompson's employment at Rikers, several times a day, she had to walk through the hallways where large groups of inmates would shout sexual comments at

9

her, often being very disrespectful, and sometimes threatening. The officer present was either

unable or unwilling to keep the inmate's behavior under control. At times, the officer would join

in the harassing conduct. One time a group of inmates started loudly singing, "She's a brick

house" as Dr. Thompson was walking down the hall.

35.     In addition, Dr. Thompson was also sexually harassed by New York City

Department of Corrections employees.

36.     In February 2016, during an alarm where Dr. Thompson was stuck in the hallway,

a corrections officer started to talk to her. The officer informed Dr. Thompson that three new

officers voted her "the hottest woman on the island." The officer also stated that there was a

"black book" where officers rate female staff based on their physical appearance including,

Mental Health staff, nurses, and correction officers.

37.     In March 2016, Dr. Thompson heard two officers discussing Dr. Thompson's

"phat ass" in front of other officers and inmate.

38.     In November 2016, a Corrections Officer told an inmate that Dr. Thompson was

"hot" and that he had gotten her telephone number.

39.     Throughout Dr. Thompson's employment at Rikers, and particularly in December

2016, corrections officers would comment on her physical appearance, making comments such

as "Hey beautiful" attempt to hug her or grab her in front of inmates, and ask her on dates.

40.     Because of the pervasive sexual harassment and retaliation at Rikers, Dr.

Thompson suffers from and was diagnosed with depression and job-related PTSD and takes

psychiatric medications.  Dr. Thompson is currently on workers compensation leave as a result

of these conditions.

*Linda Unneland*

10

41.     Ms. Unneland worked for Corizon or its corporate predecessor, at Rikers Island as a mental health clinician from September 13, 2010, until September 14, 2015. At all times material, Ms. Unneland was also jointly employed by Defendant City.

42.     Up to and including her last day of employment at Rikers, Ms. Unneland was routinely exposed to severe and pervasive sexual harassment by the inmates at Rikers, including but not limited to cat calls, threats of rape and other sexual violence, and exhibitionist masturbation.

43.     Ms. Unneland repeatedly informed her clinical supervisors and unit chiefs about the sexually harassing conduct she suffered. But Defendant Corizon and Defendant City did not take any adequate remedial measures to mitigate Ms. Unneland's sexually hostile work environment.

44.     For example, in 2014, Ms. Unneland was required to provide treatment in a clinic room within an inmate housing area to an inmate who was serving a sentence for raping a woman in a laundromat. During one of the sessions, the inmate exposed his genitalia, and began a harassment campaign against Ms. Unneland when she refused to continue meeting with him in the future. He threatened Ms. Unneland with physical harm on more than one occasion. The inmate yelled at her, "I am going to fuck you up. You better watch your back." Ms. Unneland complained to her supervisor about this behavior and he eventually arranged for the transfer of the inmate to another building, where he severely beat another female MHC. That MHC had not been warned by Corizon administrators in the other building of his predisposition to violence toward women. Ms. Unneland routinely witnessed inmates with violent histories like the inmate being shuffled from one housing area to another without prior warning to the assigned clinical staff.

45.     Another inmate who exposed his genitals and masturbated during the mental health sessions with Ms. Unneland later severely assaulted and injured a mental health intern, Stephanie Porcell, who required reconstructive surgery to her face due to sustaining a broken jaw, eye socket, and nose.

46.     There were no correction officers or anyone else close by who could have protected Ms. Unneland during sessions with inmates with histories of aggression and sex crimes. In fact, typically there was only one correction officer assigned per approximately 40 inmates, and the officer was frequently distracted by watching other inmates. In addition, correction officers frequently left their posts without giving prior notification to Ms. Unneland and the other clinicians.

47.     On March 28, 2014, Ms. Unneland sent an email to Eileen McNerny, Regional Director of Human Resources at Corizon, and Dr. Andiea Harris, Deputy Commissioner of Mental Health, expressing her concerns and distress caused by the inmate's behavior and the fact that she was left alone with him. Dr. Harris responded by suggesting that Ms. Unneland leave the housing unit at any time she did not feel safe and report the incident to the Unit Chief or a Clinical Supervisor. Such response is completely inadequate since it does nothing to prevent the incidents of violence and/or sexual harassment.

48.     In April 2014, after the severe physical assault on the intern and a separate sexual assault of another female intern by another inmate on a Mental Observation housing unit, Ms. Unneland stopped entering the housing units and conducted her sessions from the bubble area behind a plexiglass barrier for approximately one month. At that point, an inmate complained that he was not afforded enough privacy during the sessions held in this manner. Ms. Unneland was called into a meeting with Unit Chief Dorrel Hyde, Assistant Unit Chief Lauren Kennedy

and several clinical supervisors, at which time Mr. Hyde told her that "we must go into the

housing areas."

49.     On May 6, 2014, an inmate threatened Ms. Unneland and screamed obscenities at

her while she was conducting an interview with another patient. Ms. Unneland reported this

incident and expressed safety concerns via email to Mr. Hyde, Ms. Kennedy, Clinical Supervisor

Dr. Justin Simpson, and the Senior Psychiatrist Dr. Kiyoko Ogoke.

50.     Ms. Unneland sent many emails during her tenure at Corizon about the safety

breaches associated with the requirement to conduct clinical interviews in the housing areas

where multiple inmates with Aggressive Patient alerts and histories of sexual violence were

housed. In many of these housing units, there were no separate interview rooms and no adequate

DOC presence. Ms. Unneland's concerns were not addressed.

51.     On another occasion in 2014, an inmate touched Ms. Unneland's buttocks while

the security staff were distracted by a fight between two inmates in the area leading to the

housing units. Ms. Unneland had previously sent email warnings to Corizon's management that

requiring MHCs to enter the housing areas was akin to a "death trap" due to the lack of ready

exit in the event of an emergency. In addition, at all relevant times, correction officers in the

housing areas were vastly outnumbered by inmates.

52.     Corizon management to whom Ms. Unneland reported instances of sexual

harassment and/or violence and who she asked to take certain preventive measures (such as

alerting MHCs in an effective manner of patients' histories of aggression and sexual assaults;

ensuring proximity of a correction officer when an MHC is in a housing unit; making available

separate housing for decompensating patients; having plexiglass barriers between clinicians and

patients) included Dr. Neil Leibowitz, Director of Mental Health, Dr. Andiea Harris, Deputy

Director of Mental Health, Dorrel Hyde, Unit Chief, Lauren Kennedy, Assistant Unit Chief,
Fazal Yussuff, Director of Operations at Corizon, Jerome Donohue, Director of Human
Resources, Eileen McNierny, Regional Director of Human Resources,  Dr. Justin Simpson,
Clinical Supervisor, Dr.  Jessica Linnick, Clinical Supervisor, Martha Vormitagg, Director of
Human Resources, and others.

53.     In the summer of 2015, Ms. Unneland attended a meeting with Dr. Leibowitz, Dr.
Shane Konrad, Martha Vormitagg, Director of Human Resources, and a representative Local
1199, the union that represented the clinicians, and others, to address safety and sexual
harassment concerns. At the meeting, Ms. Unneland questioned Dr. Leibowitz regarding the
reason for not installing plexiglass barriers to safeguard the mental health staff. Dr. Leibowtiz
responded that the Department of Health was opposed to this idea because it made inmates seem
"animalistic." Dr. Leibowitz also suggested that the reason MHCs are assaulted is because they
sit too close to the inmates during the clinical encounters.

54.     Ms. Unneland has experienced severe emotional distress as a result of the
harassment and retaliation she has experienced.

*Sanja Medich*

55.     Ms. Medich has worked as a mental health clinician at Rikers Island since
November 2008, first for Defendant Corizon and, since January 1, 2016, now for Defendants
PAGNY and HHC.  At all relevant times, Ms. Medich has also been jointly employed by
Defendant City.

56.     At all relevant times (including towards the end of Defendant Corizon's contract
at Rikers in September through December 2015), Ms. Medich was routinely exposed to severe
and pervasive sexual harassment by inmates at Rikers, including but not limited to cat calls,

comments about her body parts, threats of rape and other sexual violence, semen and urine thrown at her, inmates exposing their genitalia, and exhibitionist masturbation.

57.    Ms. Medich repeatedly informed her clinical supervisors and unit chiefs about the sexually harassing conduct she suffered.  But Defendants did not take any adequate remedial measures to mitigate Ms. Medich's sexually hostile work environment.

58.    Ms. Medich was first sexually harassed by an inmate during her very first assignment at Rikers in or about November 2008, when the inmate asked her to repeat her name and come closer to his cell because he was getting sexual pleasure by watching how she was pronouncing her name. Although this incident was quite innocent in comparison to the sexual harassment she has later encountered, the response from Ms. Medich's entire clinical team when she reported it to her supervisor Dr. David Jurich was shocking. The entire team started laughing and making fun of her reaction to this inmate's behavior. Dr. Jurich then remarked "welcome to the jail environment."

59.    From 2008 to 2012, Ms. Medich was working at George R. Vierno Center at Rikers ("GRVC") in the morning covering three mental health units for inmates with disciplinary issues ("MHAUI") and at the AMKC in the afternoon covering all 10 units there. AMKC supervisors, including Unit Chief Diana Novak, appeared surprised that Ms. Medich was complaining about inmates' sexually inappropriate behavior and characterizing them as unlawful and clinically significant. Ms. Medich's supervisors did nothing to address such behavior and were perplexed as to why she did not want to merely ignore it. The clear message from her supervisors was and continues to be: accept the daily sexual harassment or quit.

60.    Ms. Medich decided to stay and attempt to work on changing the environment by changing awareness of people around her and modeling appropriate ways to address sexual

harassment and to treat sexually dysfunctional behaviors of patients/inmates as a mental health professional. Sexual harassment, exposing private parts, masturbating, and sexual comments continued to be daily occurrences for Ms. Medich. Her supervisors did nothing to address it, so she did all in her power to correct such behaviors through her work. However, one person is not capable of changing the entire culture of sexual harassment at Rikers. To Ms. Medich's knowledge, neither Corizon nor PAGNY established rules clearly stating what constituted sexual harassment of staff and explicitly stating that exposure of private parts to staff, for example, is against the rules.

61.     On her own, Ms. Medich found out from the DOC that it is possible to give tickets to inmates for aggressive behaviors toward civilian staff and decided to give tickets for sexually inappropriate behavior. Ms. Medich decided to use tickets as a way to psychologically educate inmates about seriousness of such behaviors as well as protect herself, but this practice was met with resistance from the DOC and Corizon. To her knowledge, nobody else at Corizon has ever given a ticket to an inmate for sexual harassment.

62.     Ms. Medich issued the first ticket in approximately 2010, when she encountered inmate E.C. on a MOD1 MO unit at AMKC. He approached Ms. Medich crying and saying his mother had died. When Ms. Medich started talking to him, he exposed his genitalia to her. Ms. Medich went to get the correction officer, whose post was far away, but the inmate tried to prevent Ms. Medich reaching the officer and threatened her saying he had a weapon hidden in the ceiling and he would kill her. He stated: "I have nothing to lose by killing you, bitch!" To a big surprise of Ms. Medich's clinical team, including Unit Chief Diana Novak, Ms. Medich caused a ticket to be issued to this inmate, when the instructions at that time were to inform a supervisor and they were to address the issue. Ms. Medich decided to issue the ticket because

Corizon never addressed her complaints of sexual harassment in any meaningful way. A few

days later, E. C. was placed in the mental health group conducted by Ms. Medich. Ms. Medich

reported this to her supervisors Mr. Hyde and Ms. Novak, who once again failed to address it in

any way. Corizon has been ignoring sexual harassment toward mental health staff coming from

this particular inmate for the past 8 years.

63.    Between 2010 and 2014, Ms. Medich was able to reduce sexual harassment from

inmates toward her because of her history of causing tickets to be issued.

64.    Ms. Medich's supervisors did not approve this practice but did not explicitly

instruct her to stop until 2014, when Corizon implemented new programs and gained full control

over mental health units, such as restrictive housing unit ("RHU"), where sexual harassment is

most common. In those programs Corizon's supervisors treated sexual harassment as any other

minor "acting out" behavior and instructed MHCs to ignore it. Instead of using tickets, clinicians

were directed to use a point system, which was in the sole discretion of Corizon's clinical

supervisors and administrators, who addressed the reported sexual harassment incidents at a

weekly team meeting where they would or would not take off points from an inmate who

sexually harassed an MHC. The points would affect the inmate's "level," with level one being

the strictest with no TV allowed, and level four as the most lenient one – allowing for a

maximum amount of chips and TV. This system is inadequate as it allows inmates to continue

engaging in self-rewarding sexual behavior, which intensifies if not addressed strongly and

immediately.

65.    When Ms. Medich was assigned overtime at GRVC RHU in October of 2014, she

observed on a regular basis a group of three to five or more inmates sexually harassing female

mental health staff, and DOC correction officers looking helpless in disapproval. When Ms.

17

Medich once instructed inmates to stop the sexual harassment immediately so that she could enter the unit, the inmates insulted her and stated, in sum and substance: "we will report you to the city; it is our right to receive services; come to us." Ms. Medich immediately reported this incident to Clinical Supervisors Dr. Cindy Ho and Dr. Pellowe and told them she would write tickets if this happens again. Dr. Ho then told Ms. Medich she must not write tickets to inmates who expose their genitalia to her and that all she can do is tell a supervisor and they will address it in a weekly team meeting. Dr. Ho then gave Ms. Medich the regular speech that this may not be the right kind of job for her and specifically told her that "if you want to work here this is what you have to deal with." Ms. Medich sent an email the same day to Dr. Harris, Deputy Director of MH at that time, and the Unit Chief Christina Minervini, expressing her concern and outrage with her employers' failure to address the ongoing sexual harassment of mental health staff by inmates and insisting that charges are brought against inmates exposing themselves to her and other MHCs. On October 28, 2014, Dr. Harris sent an email to HR telling HR that she recommended a "zero tolerance" policy for any kind of sexual harassment. Dr. Harris also asked HR if there is such policy in place.

66.     On November 4, 2014, Ms. Medich sent another email to Dr. Harris clarifying her stance on sexual harassment by inmates and complaining about the lack of protection and the lack of system to adequately respond to non-psychotic patients exposing their private parts and masturbating in front of the Mental Health staff.

67.     On February 12, 2015, Ms. Medich sent a detailed mass email to Dr. Neil Leibowitz, Rikers' Director of Mental Health, and other Rikers mental health officials once again reporting her concerns of sexual harassment by inmates and the lack of adequate protection. Instead of addressing Ms. Medich's concerns, however, she was called to the Human

Resources ("HR") office where HR Director Jerome Donohue criticized her for sending a mass distribution email. When Ms. Medich once again complained about the sexual harassment, Mr. Donohue stated, in sum and substance, that there was nothing Corizon could do, and that DOC is responsible for the safety of staff.

68.     On August 11, 2015, while Ms. Medich was talking to a patient at Harts Island Clinic at AMKC, another inmate conspicuously walked behind her and rubbed the back of Ms. Medich's hip and her stomach area with his hand in a sexual manner. Ms. Medich filed criminal charges against the inmate and obtained a restraining order. Ms. Medich also sent an email reporting the incident to a number of clinical supervisors, including Assistant Unit Chief Lauren Kennedy, Dr. Justin Simpson, Dr. Kathryn Messineo, and Dr. Kristilla Brace, and called for a discussion and measures to protect clinicians in the future.

69.     The following day, when no one responded to Ms. Medich regarding the incident, Ms. Medich sent another email to Human Resources, MH Director Dr. Leibowitz, and others. Within 15 minutes of sending this email, Unit Chief Lauren Kennedy told Ms. Medich that "HR is telling me to ask you to leave the island." Ms. Medich asked Ms. Kennedy to have this order in writing, and then received an email from HR Director Martha Vormittag asking her to report to the HR office with an 1199 representative. When Ms. Medich arrived at the HR office, there were Dr. Leibowitz and an HR employee Natalie Scott present. Ms. Medich greeted Dr. Leibowitz and attempted to discuss the sexual harassment issue, but he refused to engage with her and instead told her union representative that he "can't have this on the island." Dr. Leibowitz then asked Ms. Medich if she was taking her assignments today and insisted that she answer yes or no. Ms. Medich then asked them how this meeting was being documented, after

which Dr. Leibowitz left the office, slamming the door, and stating, in sum and substance, that he was not going to participate in this.

70.     On August 14, 2015, Corizon sent a Memorandum regarding sexual harassment by patients to all Corizon health employees. The Memorandum acknowledged that "the potential of incident is not able to be completely alleviated due to the type of environment that we work in" and advised employees to report any incident to their supervisors.

71.     On May 24, 2016, another inmate forcibly touched Ms. Medich in a sexual manner. At approximately 12:15 p.m., after she finished her rounds, an inmate approached Ms. Medich and asked if she was a mental health specialist. Ms. Medich responded affirmatively, after which he said, "I have a question," and then reached over and caressed Ms. Medich's breast. Ms. Medich filed criminal charges and obtained a restraining order against that inmate.

72.     Ms. Medich was also retaliated against by her employers for complaining about the continued sexual harassment.

73.     For example, in 2009, a group of females, including Ms. Medich and her supervisor at the time – Dr. Fiona Radcliffe – organized a support group to discuss and help each other deal with specific issues of sexual harassment at work. Shortly, however, Ms. Redcliffe instructed the group that "the higher-ups" do not allow such support groups, and their group was dissolved.

74.     In 2013, Ms. Medich's supervisor Unit Chief Diana Novak retaliated against her for complaining about and reporting incidents of inmate sexual harassment by calling her "chaos creating" and assigning her to the most dangerous patients and units, while keeping other staff away from those units at any opportunity she had.

75.     After the first forcible touching incident on August 11, 2015, the retaliation by

Corizon against Ms. Medich increased. First, Dr. Konrad, Director of MH, denied her request to transfer to a safer position at the clinic. In addition, the daily retaliation has been ranging from small remarks to assigning Ms. Medich with an increasing number of extremely difficult patients and sending Ms. Medich on a very short notice to the most dangerous units completely unfamiliar to her.

76.     Ms. Medich was also repeatedly called for meetings with four or more supervisors, who would criticize her work, even though she had done nothing wrong. For example, on February 24, 2016, Ms. Medich had a meeting with Mr. Hyde and other supervisors, where she was criticized for entering "cancelled" rather than "seen" into the inmates' paperwork in situations when a patient is sleeping or refusing to have treatment.

77.     Ms. Medich complained about the retaliation and sexual harassment by inmates to HR Director Martha Vormittag. While Ms. Vormittag acknowledged the letter and promised to get back to Ms. Medich, but never did.

78.     Ms. Medich has suffered severe emotional distress as a result of the harassment and retaliation she experienced.

*Naomi Dechoudens*

79.     Ms. Dechoudens worked for Defendant Corizon at Rikers Island as a mental health clinician from June 18, 2012, until September 28, 2015.  At all times material, Ms. Dechoudens was also jointly employed by Defendant City.

80.     From June 2012 until July 2013, Mrs. Dechoudens worked at George R. Vierno Center at Rikers ("GRVC") in the morning covering three mental health units for inmates with disciplinary issues ("MHAUII") and at the AMKC in the afternoon covering all 10 units there. From July 2013 until August 2014, Ms. Dechoudens worked on MHAUII and Restricted

Housing Units ("RHU") in GRVC. From August 2014 until September 2015, Ms. Dechoudens worked as a per-diem clinician throughout Rikers Island.

81.    Ms. Dechoudens was routinely exposed to severe and pervasive sexual harassment by inmates at Rikers, including but not limited to cat calls, threats of rape and other sexual violence, and exhibitionist masturbation.

82.    On February 11, 2014, Ms. Dechoudens was sexually assaulted by an inmate.

83.    On March 3, 2014, during a session Ms. Dechoudens was having with a client, another inmate on the unit was staring at her and masturbating. When Ms. Dechoudens requested for him to stop, he lunged at her and attempted to assault her. Ms. Dechoudens notified Corizon mental health staff and administration on the day of the incident. Two days later, Ms. Dechoudens also informed Angela Gildehaus (Corizon Corporate Management), who was visiting from the corporate office, of the incident. The inmate remained on the unit and Ms. Dechoudens refused to work on the unit.

84.    On April 17, 2014, following the assault on the intern discussed above, Ms. Dechoudens e-mailed Corizon staff and administration to inform them that the safety guidelines they distributed via e-mail were not sufficiently comprehensive. Dr. Cowan (Corizon's Medical Director), Jerome Donahue (Director of Human Resources), and Mr. Doherty (Vice President of Corizon) subsequently arrived at Ms. Dechoudens's worksite unannounced and insisted that she meet with them to discuss the e-mail. They would not allow Ms. Dechoudens to call a union representative and informed Ms. Dechoudens that she is not allowed to send e-mails of that nature. There was no discussion of the underlying sexual harassment, safety and security issues.

85.    Ms. Dechoudens repeatedly informed her clinical supervisors and unit chiefs about the sexually harassing conduct she suffered.  But Defendant Corizon and Defendant City

22

did not take any adequate remedial measures to mitigate Ms. Dechoudens's sexually hostile work environment.

86.     Ms. Dechoudens has suffered extreme emotional distress as a result of the harassment and retaliation she has experienced.

*Annie Petraro*

87.     Ms. Petraro has worked as a mental health clinician at Rikers Island since October 2013, first for Defendant Corizon and then for Defendants PAGNY and HHC.  At all relevant times, Ms. Petraro has also been jointly employed by Defendant City.

88.     At all relevant times (including towards the end of Defendant Corizon's contract at Rikers in September through December 2015), Ms. Petraro was routinely exposed to severe and pervasive sexual harassment, including but not limited to cat calls, threats of rape and other sexual violence, exhibitionist masturbation and exposure to bodily fluids including semen and urine.

89.     Ms. Petraro repeatedly informed her clinical supervisors and unit chiefs about the sexually harassing conduct she suffered.  But Defendants did not take any adequate remedial measures to mitigate Ms. Petraro's sexually hostile work environment.

90.     For example, on May 5, 2014, Ms. Petraro was held hostage by a patient in the office where mental health treatment was provided. The inmate blocked the door with a table and sat on the table, so she would not be able to get out of the office. A DOC Captain eventually pushed the table away from the door and freed her. A few days later, the patient threatened Ms. Petraro that the incident would happen again. He stated: "It's not a threat, it's a promise." Corizon's response to this incident was to change the patient's MHC, leaving the patient on the unit. Ms. Petraro was simply directed to not be on the unit alone.

91.     On July 17, 2015, a patient at AMKC housing unit, whom Ms. Petraro was required to treat at bedside, took his penis out and ejaculated in front of her saying: "You know you want that." Ms. Petraro immediately notified Unit Chief Dorrel Hyde, who told her to complete another work assignment. Ms. Petraro sent an email later that day to various Corizon administrators notifying them of the incident, bringing to their attention the inmate' history of inappropriate sexual behavior, and expressing safety concerns. Dr. Shane Konrad, Deputy Director of Mental Health, responded to the email stating "I am sorry this happened to you. As if your job is not already challenging enough! I see that you made some requests from your supervisors which I think is more than reasonable." Corizon later acknowledged that the inmate should not have been on the unit, but nothing was done to prevent such incidents in the future.

92.     Ms. Petraro had written multiple other emails about this incident but received virtually no response to her concerns.

93.     On June 9, 2016, while Ms. Petraro was at 1LB 10MOD unit monitoring suicide watches, an inmate verbally harassed her stating: "Do you know who I am? Aren't you Nicole? You got your pussy eaten by an inmate and you still work here you cunt." Ms. Petraro responded he was mistaken and she was not Nicole, but he continued the harassment. When Ms. Petraro was leaving the unit, the inmate escaped from the housing area, approached her with his hands clutched and stated: "I will kill you or have you transferred; I have nothing to lose. I am going to fucking kill you. Cunt." At the time of this incident, the inmate had 70 incidents and injury reports since 2012, yet was placed in a unit, from which he could easily escape and assault mental health staff.

94.     Ms. Petraro reported the incident to her supervisors Dorrel Hyde, Dr. Kathryn Messineo, and Dr. Brace, and expressed her position that the inmate should be placed in a

restrictive housing unit ("RHU") to address his behavioral issues, but they dismissed her concerns. The following day, Ms. Messineo made an entry into the inmate's chart, in sum and substance stating: "it's been the best this inmate has ever been."

95.     In addition, Corizon retaliated against Ms. Petraro for making this complaint by not allowing her to enter the housing area and taking away one of her job duties – crisis intervention training. After this incident, Ms. Petraro's supervisors stopped communicating with her, and, shortly thereafter, Dr. Robert Poggioli – a supervisor of her supervisors – told her: "you come to jail to be assaulted; it is what it is in jail."

96.     In July 2016, Ms. Petraro requested to start working part-time instead of fulltime due to her supervisor Dr. Hyde's retaliation against her, which included not addressing her safety / harassment concerns.

97.     Ms. Petraro's request for part-time employment was finally granted approximately a month later after her repeated emails to HR.

98.     In addition, Ms. Petraro was harassed and discriminated against based on her sex by her supervisor, Dorell Hyde, at Corizon.  Mr. Hyde singled her out for scrutiny and discipline in a way he did not for male clinicians, denied Ms. Petraro overtime and frequently disparaged Ms. Petraro's attire in front of other clinicians.

99.     Ms. Petraro has suffered extreme emotional distress as a result of the harassment and retaliation she has experienced.

*Joint Employment*

100.     Defendant City controlled and controls the site at which Plaintiffs were/are employed and oversees the mental health clinicians and the provision of mental health services at Rikers Island.

101.     Defendant City exercised immediate control and retained overall responsibility over Defendant Corizon and Defendants PAGNY and HHC employees because it shared in the hiring, firing, discipline, and/or maintaining records of Defendant Corizon and Defendant PAGNY employees assigned to work at Rikers Island.

102.     Specifically, the contract between Defendant City and Defendant Corizon reserved important management rights to Defendant City, including, but not limited to, the right to:

a.     receive on a monthly basis a list of employees, including new hires, suspensions, and terminations;

b.     undertake background investigations of employees;

c.     maintain a file with the fingerprints of employees;

d.     collect vital employee information for purposes of background investigation, including home and cell telephone numbers;

e.     set requirements for employees, including but not limited to requirements for providing clinical supervision and training in mental health issues;

f.     require employees to perform specific duties with respect to inmates; and

g.     revoke an employee's security clearance at any time.

103.     The contract between Defendant City and Defendant PAGNY also reserved important management rights to Defendant City, including, but not limited to, the right to:

h.     approve or disapprove of individual hires;

i.     undertake background investigations of employees;

j.     set employee credential requirements; and

       k.      develop and implement staffing plans that establish the qualifications for each staff member, the salary or compensation range of each staff member, and the deployment of such staff.

       l.      DOC supervisors were always present on the unit and would control Plaintiffs' work by directing them which inmates to see and which inmates to avoid seeing. DOHMH personnel would participate in clinical meetings with Plaintiffs and direct particular aspects of their work such as their whereabouts and the patients they would see. After PAGNY became some of the Plaintiffs' employer, HHC personnel functioned as those Plaintiffs' supervisors.

*Plaintiffs Thompson, Unneland and Petraro's Claims for Unpaid Wages*

104.    Plaintiff Thompson, Unneland and Petraro were compensated by Defendant Corizon at the following hourly rates:

| | |
|---|---|
| 2012 | $36.07 |
| 2013-2014 | $36.96 |
| 2015 | $38.08 |

105.    Although Plaintiffs were only paid for 37.5 hours a week and were expected to take a 30-minute meal break each day.

106.    Due to the volume of work, assigned to Plaintiffs, they worked through their meal breaks every day, resulting in 2.5 hours of unpaid work each week.

107.    In addition, the amount of work assigned to Plaintiff Unneland required her to work an additional four hours a week after she had clocked out for which she was not paid. Since these hours were in excess of 40 hours per week, Defendant Corizon should have paid Plaintiff Unneland time and a half for these hours.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Discrimination in Violation of the Title VII of the Civil Rights Act of 1964 Against Defendants City, HHC, Corizon and PAGNY)**

108.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set herein.

109.     Defendants harassed and discriminated against Plaintiffs Thompson, Unneland, Medich and Petraro in the terms and conditions of their employment on the account of sex in violation of Title VII of the Civil Rights Act of 1964.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Retaliation in Violation of Title VII Against Defendants City, HHC, Corizon and PAGNY)**

110.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set herein.

111.     Defendants retaliated against Plaintiffs Thompson, Unneland, Medich and Petraro in the terms and conditions of their employment on the account of Plaintiffs' opposition to Defendants' discrimination against Plaintiffs on the basis of their sex in violation of Title VII.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Discrimination in Violation of the New York City Human Rights Law)**

112.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set herein.

113.     Defendants harassed Plaintiffs and discriminated against Plaintiffs in the terms and conditions of their employment on the account of Plaintiffs' sex in violation of the New York City Human Rights Law.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the New York City Human Rights Law)

114.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set herein.

115.    Defendants retaliated against Plaintiffs in the terms and conditions of their employment on the account of Plaintiffs' opposition to Defendants' discrimination against Plaintiffs on the basis of their sex in violation of the New York City Human Rights Law.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (By Plaintiffs Unneland and Petraro against Defendant Corizon in Violation of the New York Labor Law, § 650 *et seq.*)

116.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above as if fully set forth herein.

117.    During the relevant time periods, Defendant Corizon failed to pay Plaintiffs Thompson, Unneland and Petraro's wages in violation of the New York Labor Law, §650 *et seq.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an award:

(a)    Declaring the acts and practices complained of herein are in violation of the Constitution, Title VII and/or the NYCHRL;

(b)    Enjoining and permanently restraining these violations of the Constitution, Title VII and/or the NYCHRL;

(c)    Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

(e)    Directing Defendants to pay punitive damages as to the maximum extent permitted by law;

(f)     Awarding Plaintiffs compensatory damages, including but not limited to damages for the emotional distress, humiliation, pain and suffering, and/or mental anguish Defendants' conduct has caused Plaintiffs;

(g)     Awarding Plaintiffs Thompson, Unneland and Petraro unpaid wages;

(h)     Awarding Plaintiff Thompson, Unneland and Petraro liquidated damages under the New York Labor Law § 663);

(g)     Awarding Plaintiffs such interest as is allowed by law;

(h)     Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(i)     Granting such other and further relief as the Court deems necessary and proper.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action.

Dated: New York, New York
        August 8, 2018

_____/s_____
Jason L. Solotaroff
GISKAN SOLOTAROFF & ANDERSON LLP
217 Centre Street, 6th Floor
New York, NY 10004
jsolotaroff@gslawny.com
*Attorneys for Plaintiffs*

# EXHIBIT A

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | **Annie Petraro** | From: | **New York District Office** |
|---|---|---|---|
| | **51 Hewlett Point Ave** | | **33 Whitehall Street** |
| | **East Rockaway, NY 11518** | | **5th Floor** |
| | | | **New York, NY 10004** |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2016-03041** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

(See also the additional information enclosed with this form.)

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**Kevin J. Berry,**
**District Director**

MAY 0 9 2018

(Date Mailed)

cc: **Attn**
**Director of Human Resources**
**CORIZON HEALTH, INC.**
**103 Powell Court**
**Brentwood, TN 37027**

**Raymond Audain, Esq.**
**GISKAN SOLOTAROFF & ANDERSON**
**11 Broadway, Suite 2150**
**New York, NY 10004**

EEOC Form 161-B (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| | |
|---|---|
| To:  **Annie Petraro**<br>**51 Hewlett Point Ave**<br>**East Rockaway, NY 11518** | From:  **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

| |
|---|
| ☐ *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-00141** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**Kevin J. Berry,**
**District Director**

MAY 0 9 2018

*(Date Mailed)*

cc:      **Attn**
**Director of Human Resources**
**PHYSICIAN AFFILIATE GROUP OF NEW YORK PC**
**55 West 125th Street**
**New York, NY 10027**

Aliaksandra Ramanenka, Esq.
GISKAN SOLOTAROFF & ANDERSON
217 Center Street, 6th Floor
New York, NY 10013

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Linda Unneland**<br>**4 New Street**<br>**Pleasantville, NY 10570** | From:  **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

| | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-00140** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

- [X] More than 180 days have passed since the filing of this charge.

- [ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

- [X] The EEOC is terminating its processing of this charge.

- [ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

- [ ] The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

- [ ] The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred** <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

**Kevin J. Berry,**
**District Director**

MAY 0 9 2018

*(Date Mailed)*

Enclosures(s)

cc:
| | |
|---|---|
| **Attn**<br>**Director of Human Resources**<br>**PHYSICIAN AFFILIATE GROUP OF NEW YORK PC**<br>**55 West 125th Street**<br>**New York, NY 10027** | **Raymond Audain**<br>**GISKAN SOLOTAROFF & ANDERSON, LLP**<br>**11 Broadway, Suite 2150**<br>**New York, NY 10004** |

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Linda Unneland**<br>**4 New Street**<br>**Pleasantville, NY 10570** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

| | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2016-03018** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

**Kevin J. Berry,**
**District Director**

MAY 0 9 2018

*(Date Mailed)*

Enclosures(s)

cc:

**Attn**
**Director of Human Resources**
**CORIZON HEALTH INC.**
**103 Powell Court**
**Brentwood, TN 37027**

**Raymond Audain, Esq.**
**GISKAN SOLOTAROFF & ANDERSON**
**11 Broadway, Suite 2150**
**New York, NY 10004**

EEOC Form 161-B (11/16)

**U.S. Equal Employment Opportunity Commission**

## Notice of Right to Sue *(Issued on Request)*

| | |
|---|---|
| To:  **Serena Thompson**<br>**13 Alison Road**<br>**Roselle, NJ 07203** | From:  **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

    ☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2016-03039** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

**Notice to the Person Aggrieved:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Kevin J. Berry*      **MAY 09 2018**

**Kevin J. Berry,**
**District Director**

*(Date Mailed)*

Enclosures(s)

cc:  **Attn**
**Director of Human Resources**
**CORIZON HEALTH, INC.**
**103 Powell Court**
**Brentwood, TN 37027**

**Raymond Audain, Esq.**
**GISKAN SOLOTAROFF & ANDERSON**
**11 Broadway, Suite 2150**
**New York, NY 10004**

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Serena Thompson**<br>    **13 Alison Road**<br>    **Roselle, NJ 07203** | From:  **New York District Office**<br>       **33 Whitehall Street**<br>       **5th Floor**<br>       **New York, NY 10004** |

| | *On behalf of person(s) aggrieved whose identity is* *CONFIDENTIAL (29 CFR §1601.7(a))* | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-00142** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| | |
|---|---|
| [X] | More than 180 days have passed since the filing of this charge. |
| [ ] | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| [X] | The EEOC is terminating its processing of this charge. |
| [ ] | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| | |
|---|---|
| [ ] | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice**. Otherwise, your right to sue based on the above-numbered charge will be lost. |
| [ ] | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

**MAY 0 9 2018**

Enclosures(s)

**Kevin J. Berry,**
**District Director**

*(Date Mailed)*

cc:

**Attn**
**Director of Human Resouces**
**PHYSICIAN AFFILIATE GROUP OF NEW YORK PC**
**55 West 125th Street**
**New York, NY 10027**

**Raymond Audain**
**GISKAN SOLOTAROFF & ANDERSON, LLP**
**11 Broadway, Suite 2150**
**New York, NY 10004**

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | **Sanja Medich**<br>**623 West 170th Street, Apt. 3-D**<br>**New York, NY 10032** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2016-03017** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

| | |
|---|---|
| **X** | More than 180 days have passed since the filing of this charge. |
| ☐ | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| **X** | The EEOC is terminating its processing of this charge. |
| ☐ | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case**:

| | |
|---|---|
| ☐ | The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost. |
| ☐ | The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

**MAY 0 9 2018**

Enclosures(s)

**Kevin J. Berry,**<br>**District Director**

*(Date Mailed)*

cc:

**Attn**<br>**Director of Human Resources**<br>**CORIZON HEALTH INC.**<br>**103 Powell Court**<br>**Brentwood, TN 37027**

**Raymond Audain, Esq.**<br>**GISKAN SOLOTAROFF & ANDERSON**<br>**11 Broadway, Suite 2150**<br>**New York, NY 10004**

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Sanja Medich**<br>**623 West 170th Street, Apt. 3-D**<br>**New York, NY 10032** | From:  **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-00139** | **Paul Young,**<br>**Investigator** | **(212) 336-3783** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☒  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred** <u>more than 2 years (3 years)</u> **before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*                                                            MAY 0 9 2018

Enclosures(s)

**Kevin J. Berry,**
**District Director**

*(Date Mailed)*

cc:   **Diana Goell Voigt, Esq.**
      **General Counsel**
      **PHYSICIAN AFFILIATE GROUP OF NEW YORK PC**
      **55 West 125th Street, Suite 1001**
      **New York, NY 10027**

      **Raymond Audain**
      **GISKAN SOLOTAROFF & ANDERSON, LLP**
      **11 Broadway, Suite 2150**
      **New York, NY 10004**