# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SERENA THOMPSON, LINDA UNNELAND, SANJA MEDICH, NAOMI DECHOUDENS, and ANNIE PETRARO,

Plaintiffs,

v.

CORIZON HEALTH, INC., PHYSICIAN AFFILIATE GROUP OF NEW YORK, P.C., THE NEW YORK CITY HEALTH & HOSPITALS CORPORATION, THE CITY OF NEW YORK,

Defendants.

Civil Action No. 18-7139 (LGS)

***Document Filed Electronically***

---

## CORIZON HEALTH, INC.'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

---

Jennine DiSomma (jdisomma@saiber.com)
Vincent C. Cirilli (vcirilli@saiber.com)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
(973) 622-3333
*Attorneys for Defendant*
*Corizon Health, Inc.*

Dated: February 12, 2020

# **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

ARGUMENT .........................................................................................................................3

POINT I ...............................................................................................................................3

DECHOUDENS' SEXUAL HARASSMENT DISCRIMINATION CLAIM IS
 TIME BARRED...................................................................................................................3

POINT II .............................................................................................................................4

PLAINTIFFS' SEXUAL HARASSMENT DISCRIMINATION CLAIM BASED
 ON A HOSTILE WORK ENVIRONMENT FAILS AS A MATTER OF LAW ........................4

      A.    Corizon is Not Liable for the Alleged Acts of
           Third-Party Inmates Over Whom Corizon
           Exercises No Control ..............................................................................5

      B.    Notwithstanding Corizon's Lack of Control,
           Corizon Took Significant Steps to Address
           Violence and Sexually Inappropriate Conduct ......................................9

                1.    Specific Remediation Efforts Related to
                      Thompson's Complaints ..............................................12

                2.    Specific Remediation Efforts Related to
                      Unneland's Complaints ...............................................13

                3.    Specific Remediation Efforts Related to
                      Medich's Complaints ...................................................14

                  4.    Specific Remediation Efforts Related to
                      Dechoudens' Complaints .............................................15

      C.    Plaintiffs' Complaints Do Not Concern Sex
           Discrimination .....................................................................................16

                  1.    Plaintiffs' Allegations Concerning Violence
                      Cannot Support a Sexual Harassment Claim ................17

                  2.    The Remainder of Plaintiffs' Allegations
                      Concern the Treatment of Inmates with

i

Severe Mental Illnesses and Cannot Serve as
a Basis to Maintain a Sexual Harassment
Claim ...................................................................................................19

POINT III .......................................................................................................................22

PLAINTIFFS' RETALIATION CLAIMS FAIL AS A MATTER OF LAW ..............................22

    A.    Plaintiffs Did Not Engage in the Type of
Protected Activity That Would Have Made
Corizon Aware of the Discriminatory Nature
of Their Objections .................................................................................23

    B.    Plaintiffs Provide No Evidence that Corizon
Engaged in Retaliatory Conduct .............................................................25

    C.    Plaintiffs Provide No Evidence of any Causal
Connection Between Complaints and any
Alleged Retaliatory Conduct...................................................................29

    D.    Corizon Had Legitimate, Non-Retaliatory
Reasons for the Actions Taken ...............................................................31

POINT IV .......................................................................................................................32

PLAINTIFFS' WAGE AND HOUR CLAIMS FAIL AS A MATTER OF LAW ......................32

CONCLUSION................................................................................................................36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

Ahmed v. Am. Museum of Natural History,
   2019 U.S. App. LEXIS 31499 (2d Cir. Oct. 21, 2019)............................................................32

Aiossa v. Bank of Am., N.A.,
   2012 U.S. Dist. LEXIS 135699 (E.D.N.Y. Sept. 21, 2012)....................................................31

Augustine v. Cornell Univ.,
   2018 U.S. Dist. LEXIS 49779 (S.D.N.Y. Mar. 26, 2018), aff'd, Brown v.
   Cornell Univ., 758 Fed. App'x 226 (2019)...............................................................................26

Batchelor v. City of N.Y.,
   2014 U.S. Dist. LEXIS 46921 (E.D.N.Y. Feb. 16, 2014)...................................................28, 29

Beecher v. TWC Admin. LLC,
   2016 U.S. Dist. LEXIS 112617 (W.D.N.Y. Aug. 22, 2016) .............................................33, 35

Bennett v. Verizon Wireless,
   326 F. App'x 9 (2d Cir. 2009) ..................................................................................................31

Blanc v. Sagem Morpo, Inc.,
   394 F. App'x 808 (2d Cir. 2010) ..............................................................................................22

Brightman v. Prison Health Serv., Inc.,
   108 A.D.3d 739 (2nd Dep't 2013) ......................................................................................22, 23

Bronner v. Catholic Charities of the Roman Catholic Diocese of Syracuse, Inc.,
   2010 U.S. Dist. LEXIS 23805 (N.D.N.Y. Mar. 15, 2010)........................................................6

Brook v. Overseas Media, Inc.,
   69 A.D.3d 444 (1st Dep't 2010) ...............................................................................................23

Brown v. City of N.Y.,
   2019 Slip Op. 30565[U] (Sup. Ct. 2019) ............................................................................23, 25

Brown v. Cornell Univ.,
   758 Fed. App'x 226 (2019)........................................................................................................27

Cadet-Legros v. N.Y. Univ. Hosp. Ctr.,
   135 A.D.3d 196 (1st Dep't 2015) .............................................................................................22

Chin v. N.Y. City Hous. Auth.,
   106 A.D.3d 443 (1st Dep't 2013) .........................................................................................26, 28

Clark v. Morelli Ratner PC,
    73 A.D.3d 591 (1st Dep't 2010) ........................................................................10

Curto v. Zittel's Dairy Farm,
    26 A.D.3d 808 (4th Dept. 2006) ....................................................................6, 16

Daniel v. Cal. Dep't of Corr. & Rehab.,
    2013 U.S. Dist. LEXIS 181441 (E.D. Cal. Dec. 26, 2013) ..............................19

Dillon v. Ned Mgmt., Inc.,
    85 F. Supp. 3d 639 (E.D.N.Y 2015) ................................................................17

Dixon v Int'l Fed'n of Accountants,
    416 F. App'x 107 (2d Cir. 2011) ......................................................................30

Drumm v. S.U.N.Y. Geneseo College,
    486 Fed. App'x 912 (2d Cir. 2012) ..................................................................24

Equal Emp't Opportunity Comission v. Mavis Disc. Tire,
    2013 U.S. Dist. LEXIS 141038 (S.D.N.Y. Sep. 30, 2013) ............................5, 16

Erasmus v. Deutsche Bank Ams. Holding Corp.,
    2015 U.S. Dist. LEXIS 160351 (S.D.N.Y. Nov. 30, 2015) ................................5

Fattoruso v. Hilton Grand Vacations Co., LLC,
    873 F. Supp. 2d 569 (S.D.N.Y. 2012) ..............................................................17

Fernandez v POP Displays,
    2017 N.Y. Misc. LEXIS 21 (Sup. Ct. Jan. 3, 2017) ..........................................5

Fletcher v. Dakota, Inc.,
    99 A.D.3d 43 (1st Dep't 2012) .........................................................................26

Forrester v. Corizon Health, Inc.,
    752 Fed. App'x 64 (2d Cir. 2018) ....................................................................29

Fruchtman v. City of N.Y.,
    129 A.D. 3d 500 (1st Dep't 2015) ....................................................................24

Gaughan v. Rubenstein,
    261 F. Supp. 3d 390 (S.D.N.Y. 2017) ..............................................................29

Hicks v. Alabama,
    45 F. Supp. 2d 921 (S.D. Ala. 1998) ..................................................................7

Hinterberger v. Catholic Health Sys.,
    299 F.R.D. 22 (W.D.N.Y. 2014) ......................................................................33

Joza v. WW JFK LLC,
    2010 U.S. Dist. LEXIS 94419 (E.D.N.Y. Sept. 9, 2010)....................................................34, 35

Kassner v. 2nd Ave. Delicatessen, Inc.,
    496 F.3d 229 (2d Cir. 2007)............................................................................................3

Kuebal v. Black & Decker Inc.,
    643 F.3d 352 (2d Cir. 2011)............................................................................................32

Ladepo v. United Cerebral Palsy of N.Y.C., Inc.,
    2018 U.S. Dist. LEXIS 155793 (S.D.N.Y. Sept. 12, 2018)...............................................19

Lewis v. Univ. of Connecticut, Health Ctr., Corr. Managed Health Care,
    2011 U.S. Dist. LEXIS 126913 (D. Conn. Nov. 2, 2011) .......................................................6

Magnoni v. Smith & Laquercia, LLP,
    701 F. Supp. 2d 497 (S.D.N.Y. 2010), aff'd, 483 Fed. App'x 613 (2d Cir.
    2012) ...............................................................................................................................17

Maine v. Okla. Dep't of Corr.,
    1997 U.S. App. LEXIS 26982 (10th Cir. Sep. 30, 1997) .......................................................7

Malena v. Victoria's Secret Direct, LLC,
    886 F. Supp. 2d 349 (S.D.N.Y. 2012)..........................................................................2, 3

McCalla v. City of N.Y.,
    2017 U.S. Dist. LEXIS 130040 (S.D.N.Y. Aug. 14, 2017) .......................................................3

McGullam v. Cedar Graphics, Inc.,
    609 F.3d 70 (2d Cir. 2010)............................................................................................4

Mejia v. T.N. 888 Eighth Ave. LLC Co.,
    169 A.D.3d 613 (1st Dept. 2019)........................................................................................3

Mi-Kyung Cho v Young Bin Café,
    42 F Supp. 3d 495 (S.D.N.Y. 2013)..............................................................................24, 25

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
    715 F.3d 102 (2d Cir. 2013)....................................................................17, 22, 26, 29

Mohamed v. N.Y. Univ.,
    2015 U.S. Dist. LEXIS 68164 (S.D.N.Y. May 21, 2015)......................................................23

Moon v. Kwon,
    248 F. Supp. 2d 201 (S.D.N.Y. 2002)..........................................................................33

Mooney v. City of N.Y.,
    2019 U.S. Dist. LEXIS 157262 (S.D.N.Y. Sept. 13, 2019)...................................23, 26, 27, 29

Ochei v. Coler/Goldwater Mem'l Hosp.,
        450 F. Supp. 2d 275 (S.D.N.Y. 2006)......................................................................10

Patterson v. CBS, Inc.,
        2000 U.S. Dist. LEXIS 6916 (S.D.N.Y. May 18, 2000)...........................................4

Powell v. Morris,
        37 F.Supp. 2d 1011 (S.D. Ohio 1999) .....................................................................7

Reich v. S. New England Telecomm. Corp.,
        121 F.3d 58 (2d Cir. 1997).......................................................................................33

Rogers v. Bank of N.Y. Mellon,
        2016 U.S. Dist. LEXIS 107780 (S.D.N.Y. Aug. 15, 2016).....................................17

Sanderson-Burgess v. City of N.Y.,
        173 A.D.3d 1233 (1st Dep't 2019) ..........................................................................10

Sarr v. Saks Fifth Ave. LLC,
        2016 N.Y. Slip Op. 31751[U] (Sup. Ct. 2016) .......................................................22

Seever v. Carrols Corp., 528 F. Supp. 2d 159 (W.D.N.Y. 2007)  ..................................35

Slayton v. Ohio Dep't of Youth Servs.,
        206 F.3d 669, 677 (6th Cir. 2000) ...........................................................................20

Springs v. City of N.Y.,
        2019 U.S. Dist. LEXIS 55094 (S.D.N.Y. Mar. 29, 2019) .......................................10

Talwar v. Staten Island Univ. Hosp.,
        610 F. App'x 28 (2d Cir. 2015) ...............................................................................25

Taylor v. City of N.Y.,
        207 F. Supp. 3d 293 (S.D.N.Y. 2016)...............................................................26, 28

Thelwell v. City of N.Y.,
        2015 U.S. Dist. LEXIS 98406 (S.D.N.Y. July 28, 2015), aff'd, 733 Fed.
        App'x 561 (2d Cir. 2018)..........................................................................................18

Torres v. City of New York,
        2019 U.S. Dist. LEXIS 68168 (S.D.N.Y. Apr. 22, 2019)......................................5, 6

Vajdl v. Mesabi Academy of KidsPeace, Inc.,
        484 F.3d 546 (8th Cir. 2007) ...................................................................................19

Villar v. City of N.Y.,
        135 F. Supp. 3d 105 (S.D.N.Y. 2015).....................................................................29

Viruet v. Citizen Advice Bureau,
   2002 U.S. Dist. LEXIS 15045 (S.D.N.Y. Aug. 15, 2002) .......................................................6

Watson v. N.Y. Pressman's Union No. 2, NYP Holdings Inc.,
   444 Fed. App'x 500 (2011)...........................................................................................18

Williams v. Astra USA, Inc.,
   68 F. Supp. 2d 29 (D. Mass. 1999) .................................................................................6

Williams v. N.Y.C. Hous. Auth.,
   61 A.D.3d 62 (1st Dep't 2009) .............................................................................5, 14, 18

Wilson v. N.Y.P. Holdings, Inc.,
   2009 U.S. Dist. LEXIS 28876 (S.D.N.Y. Mar. 31, 2009), aff'd, Watson v.
   N.Y. Pressman's Union No. 2, NYP Holdings Inc., 444 Fed. App'x 500
   (2011).......................................................................................................................18

Wolman v. Catholic Health Sys. of Long Island, Inc.,
   853 F. Supp. 2d 290 (2d Cir. 2013) ...............................................................................34

Ya-Chen Chen v. City Univ. of N.Y.,
   805 F.3d 75 (2d Cir. 2015)...........................................................................................29

Zakrzewska v. New Sch.,
   14 N.Y.3d 469 (2010) .....................................................................................................5

## PRELIMINARY STATEMENT

Defendant, Corizon Health, Inc. ("Corizon"), respectfully submits this brief in support of its motion for summary judgment.

Corizon is a privately held prison healthcare contractor that provides healthcare services to inmates at various prison and jail facilities across the Unites States.  One of its contracts was with the New York Department of Health and Mental Hygiene ("DOHMH").  Pursuant to that contract, Corizon was to provide healthcare services, including mental health services, to inmates at the Rikers Island jail complex.

As a contractor, Corizon was at the mercy of the DOHMH, the New York Department of Corrections ("DOC"), and the City of New York regarding the physical layout of the Rikers Island facility (and any modifications thereto), disciplining and transferring of inmates, DOC staff, general security, and more.  Although Corizon could encourage the DOC to take specific steps to improve safety and security in the jail -- and repeatedly did so -- ultimately, Corizon was a guest in the DOC's home such that if the DOC did not undertake the requested measures, it became a bottleneck in Corizon's operations.

Plaintiffs are five licensed mental health clinicians ("MHCs") who were previously employed by Corizon to provide mental health services to inmates at Rikers Island.  Plaintiffs have sued not only Corizon but also the City of New York, among other defendants, alleging, inter alia, that they were sexually harassed by inmates at Rikers Island in violation of the New York City Human Rights Law ("NYCHRL").  Plaintiffs are effectively attempting to hold Corizon liable for either failing to completely eradicate all forms of sexually inappropriate behavior by inmates at Rikers Island -- which is indisputably not possible given that the facility houses numerous violent and severely mentally ill inmates -- or for the DOC's failure to implement certain requested measures that are indisputably beyond Corizon's control.

Plaintiffs recognize, however, as they must, that Corizon's ability to control the conduct of inmates was limited when compared to the level of control exercised by the DOC. Notwithstanding Corizon's lack of control, Corizon implemented numerous measures designed to reduce incidents of sexually inappropriate behavior by inmates and improve staff safety, which are discussed in more detail below.

In addition, the record establishes that Corizon responded to specific complaints raised by Plaintiffs throughout their employment with Corizon.  The record is rife with email communications from high-level Corizon personnel, including the Director of Mental Health, to DOC personnel demanding that it address these complaints.  At all times, Corizon served as an ally of Plaintiffs, frequently pressing the DOC to implement Plaintiffs' requests.

Although Corizon understands the difficulties of working in a jail environment, a review of the record makes it abundantly clear that Corizon did all that it could to prevent and remediate instances of sexual harassment and improve safety conditions.  When asked at their depositions what more Corizon could have done to address Plaintiffs' complaints, they listed several items that they too acknowledged were only within the purview of the DOC.

The purpose of the NYCHRL is to encourage employers to eliminate and prevent discrimination in the workplace.  To hold Corizon liable for any purported failings by the DOC, however, does not further this purpose because there is no additional, reasonable remedial measure Corizon could have possibly employed beyond what it employed that could overcome the bottleneck created by the DOC, DOHMH, and the City of New York.  The law does not recognize Corizon to be insurer of a discrimination-free work environment, especially where that environment is a jail housing violent, mentally-ill inmates over whom Corizon undisputedly exercises no control.

Accordingly, Plaintiffs' NYCHRL sexual discrimination claim against Corizon cannot survive summary judgment.  In addition, summary judgment on Plaintiffs' remaining retaliation and wage claims is appropriate for the reasons set forth below.

## STATEMENT OF FACTS

Corizon hereby incorporates by reference the facts contained in its Statement of Material Facts ("SMF").

## ARGUMENT

### POINT I

### DECHOUDENS' SEXUAL HARASSMENT DISCRIMINATION CLAIM IS TIME BARRED

Claims under the NYCHRL must be filed within three years of the date of the alleged discriminatory or retaliatory act.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 238 (2d Cir. 2007); McCalla v. City of N.Y., 2017 U.S. Dist. LEXIS 130040, at *82 (S.D.N.Y. Aug. 14, 2017).  The only claim brought by Dechoudens is a sex discrimination claim under the NYCHRL, and it is time barred.

Dechoudens' last day of employment at Corizon was September 28, 2015.  ECF No. 1 ¶ 79.  During the one-month period between August 8, 2015 and September 28, 2015, Dechoudens did not raise a single complaint of discrimination.  Indeed, the record is utterly devoid of any allegations by Dechoudens during this limited timeframe.  Because there are no allegations or any documentary evidence suggesting that any sexually harassing conduct was directed to Dechoudens during this one-month period, Dechoudens' NYCHRL claim is time barred in its entirety.  Mejia v. T.N. 888 Eighth Ave. LLC Co., 169 A.D.3d 613, 614 (1st Dept. 2019) (affirming summary judgment in favor of defendant on NYCHRL sexual harassment hostile work environment claim where plaintiff failed to identify any specific incidents of harassment

occurring within the limitations period and where general allegations that she was exposed to actionable conduct within limitations period were insufficient to raise triable issue of fact); Patterson v. CBS, Inc., 2000 U.S. Dist. LEXIS 6916, at *9 (S.D.N.Y. May 18, 2000) (holding that discrimination allegations outside the NYCHRL limitations period were time barred and declining to apply continuing violation doctrine where alleged acts of harassment were caused over an extended period of time by different individuals).[1]

Accordingly, Corizon is entitled to summary judgment on Dechoudens' sole discrimination claim under the NYCHRL.[2]

## POINT II

### PLAINTIFFS' SEXUAL HARASSMENT DISCRIMINATION CLAIM BASED ON A HOSTILE WORK ENVIRONMENT FAILS AS A MATTER OF LAW

Plaintiffs' sexual harassment discrimination claim based on a hostile work environment fails as to Corizon for three reasons: (1) all of the alleged complained-of conduct was committed by third-parties over whom Corizon exercises no control, (2) notwithstanding Corizon's lack of control, Corizon implemented all preventative and remedial measures it could to stop the alleged sexually inappropriate conduct; and (3) the majority of Plaintiffs' complaints do not involve sexual harassment but rather gender-neutral complaints of safety and non-actionable behavior that do not constitute discrimination.

---

[1] To the extent Dechoudens intends to rely on the "continuing violation doctrine" to salvage her claim, this is unavailing because no harassing conduct occurred during the three-year limitations period. McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) (act contributing to hostile work environment must take place within statutory time period). Moreover, the doctrine is inapplicable as to all Plaintiffs because the complained-of acts occurred over a long period of time, were committed by different inmates, were committed in different locations, were directed at different individuals, and Corizon took several intervening actions such that the acts are not "part of the same actionable hostile work environment practice." See id. at 76.

[2] The NYCHRL statute of limitations significantly limits the scope of timely claims with respect to the remaining Plaintiffs such that allegations falling outside the limitations period are not actionable.

**A.    Corizon is Not Liable for the Alleged Acts of Third-Party Inmates Over Whom Corizon Exercises No Control**

Plaintiffs' sexual harassment claim against Corizon fails because the undisputed evidence shows that Corizon had no control over the conduct of inmates or DOC personnel that they allege engaged in the inappropriate conduct.  As such, Corizon cannot be held liable as a matter of law for the acts committed by these third-parties.

Unlike Title VII, the NYCHRL adopts a more rigorous standard than federal law on when to impute liability to an employer for the conduct of third parties over whom the employer exercises no control.  Torres v. City of New York, 2019 U.S. Dist. LEXIS 68168, at *16 (S.D.N.Y. Apr. 22, 2019) (J. Schofield).  The NYCHRL imposes liability on an employer in only three instances: (1) "where the offending employee 'exercised managerial or supervisory responsibility'"; (2) "where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action'"; and (3) "where the employee 'should have known' of the offending employee's unlawful discriminatory conduct yet 'failed to exercise reasonable diligence to prevent [it].'"  Zakrzewska v. New Sch., 14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)(b));  Erasmus v. Deutsche Bank Ams. Holding Corp., 2015 U.S. Dist. LEXIS 160351 (S.D.N.Y. Nov. 30, 2015);  Torres, 2019 U.S. Dist. LEXIS 68168, at *17.

No liability under the NYCHRL can be imposed on an employer for the conduct of third-parties unless "a specific basis exists for imputing the conduct that created the hostile work environment to the employer."  Fernandez v POP Displays, 2017 N.Y. Misc. LEXIS 21, *5 (Sup. Ct. Jan. 3, 2017) (citing Williams, 61 A.D.3d 62).  The burden is on Plaintiffs to demonstrate that Corizon "acquiesced" or failed to exercise "reasonable diligence" to prevent the complained-of behavior.  See Equal Emp't Opportunity Comission v. Mavis Disc. Tire, 2013 U.S. Dist. LEXIS

5

141038, at *16-17 (S.D.N.Y. Sep. 30, 2013) ("To prevail on this claim, Plaintiffs would bear the additional burden of demonstrat[ing] that the employer acquiesced in the discriminatory conduct or subsequently condoned it." (internal quotation marks omitted)); Curto v. Zittel's Dairy Farm, 26 A.D.3d 808, 809 (4th Dept. 2006) (holding that plaintiff failed to satisfy burden of demonstrating acquiescence).

The extent of the employer's control over the third-party is a critical consideration, and Courts have routinely declined to impose liability on employers where the employer lacked such control. See Torres, 2019 U.S. Dist. LEXIS 68168, at *16 (J. Schofield) (stating that "the NYCHRL adopts a more rigorous standard than federal law to impute liability to an employer" and dismissing NYCHRL claim because plaintiff did not allege that defendant "acquiesced" in harasser's discriminatory conduct); Viruet v. Citizen Advice Bureau, 2002 U.S. Dist. LEXIS 15045, *64-67 (S.D.N.Y. Aug. 15, 2002) (granting summary judgment in favor of employer where plaintiff failed to proffer evidence that employer knew of derogatory language uttered by clients and where employer had "little or no control over clients' language and behavior"); Lewis v. Univ. of Connecticut, Health Ctr., Corr. Managed Health Care, 2011 U.S. Dist. LEXIS 126913, *13-15 (D. Conn. Nov. 2, 2011) (granting motion to dismiss hostile work environment claim where plaintiff failed to allege that employer, provider of health services to inmates, exercised any control over the department of corrections employees that were allegedly harassing plaintiff on the basis of race); Williams v. Astra USA, Inc., 68 F. Supp. 2d 29, 35 (D. Mass. 1999) (holding employer not liable for acts performed by third-parties over whom employer had no control).

This is particularly true where the alleged harassment was caused by inmates or patients. See Bronner v. Catholic Charities of the Roman Catholic Diocese of Syracuse, Inc., 2010 U.S.

Dist. LEXIS 23805, at *50-53 (N.D.N.Y. Mar. 15, 2010) (granting summary judgment on hostile work environment claim based upon comments and actions made by group home residents); Powell v. Morris, 37 F.Supp. 2d 1011, 1017 (S.D. Ohio 1999) (explaining that "the propensity of courts to decline imposing liability for prisoner acts is based on solid logical and practical foundations: anyone who works at a prison, particularly in a position with frequent inmate contact, must expect some off-color interactions."); Hicks v. Alabama, 45 F. Supp. 2d 921, 933 (S.D. Ala. 1998) (holding employer not liable for inmates' sexually-explicit conduct where plaintiffs were "unable to identify any measure which could have been employed to curtail the inmate's conduct but was deliberately withheld by the defendants"); Maine v. Okla. Dep't of Corr., 1997 U.S. App. LEXIS 26982, at *7 (10th Cir. Sep. 30, 1997) ("The actions of those inmates who behaved in an overtly sexual manner in front of plaintiff and sent her the obscene letter cannot, as the district court concluded, be attributed to defendants . . . [because] [t]he record demonstrates MACC officials did discipline many of these inmates in response to plaintiff's complaints, including the inmate who wrote the threatening letter.").

There is no question that the New York City Department of Corrections -- and only the DOC -- provides security at the Rikers Island facility and is responsible for the conduct and discipline of the inmates incarcerated there.  Deputy Warden John Gallagher explicitly testified that the "fundamental job" of the DOC "is the safety of everyone in the unit[.]"  SMF ¶ 9.  Although clinical care was the responsibility of Corizon, security and inmate discipline was solely within the purview of the DOC.  Id. ¶ 11.  Indeed, although the DOHMH contract sets forth all of Corizon's obligations with respect to the services it was to provide at Rikers Island, it unsurprisingly contains no section requiring Corizon to maintain control over the inmates and the facility.

In furtherance of the DOC's obligation to ensure control over the inmates, the DOC provided every inmate with an Inmate Rule Book ("IRB") upon admission, which sets forth the rules inmates are expected to follow and the potential infractions for any offenses.  Id. ¶ 12.  The IRB specifically prohibits inmates from assaulting staff and engaging in "sex offenses," which is broadly defined to include inmate exposure of "private parts," and encompasses the conduct that serves as the basis for Plaintiffs' Complaint.  Id. ¶ 13.  The IRB also contains a section describing the DOC's system for disciplining inmates with respect to Plaintiffs' complained-of conduct.

As if to remove any doubt, Corizon made it clear to all of its employees, including Plaintiffs, that the DOC was responsible for addressing complaints concerning inmate behavior and implementing appropriate remedial measures.  By way of example only:

- Corizon's Workplace Violence Prevention Policy explicitly states that "Corizon Health does not own or operate the correctional facilities and, as such, is not responsible for providing security to all civilian personnel working in the correctional system."  Id. ¶ 17.

- In an August 14, 2015 memorandum, Corizon encouraged staff to report instances of sexual harassment directly to the DOC without fear of retaliation.  Id. ¶ 136.

- In a November 30, 2015 email, clinical supervisor Kathryn Messineo explained that the "placement and transfer of patients is an ongoing DOC issue."  Id. ¶ 48.

- As demonstrated in more detail below, not only did Corizon promptly forward all complaints concerning sexually inappropriate inmate behavior and safety to the DOC -- the entity responsible for maintaining control over the inmates -- but encouraged its staff to directly file written complaints with the DOC about such conduct.

In written correspondence and testimony, Plaintiffs admitted that the DOC was responsible for implementing the remedial measures they desired.[3]  For example, Thompson's list of remedial measures went beyond Corizon's authority and required the DOC to implement,

---

[3] These remedial measures overwhelmingly concerned issues of non-actionable general safety instead of sexual harassment.

*which Thompson admitted*. These remedial measures included (1) having the DOC limit the timing when the inmates would shower, (2) additional handcuffs, (3) removal of certain patients off the unit, and (4) having an escort officer. Id. ¶ 108. The record is rife of examples making it clear that the remedial measures requested were solely within the purview of the DOC:

- Thompson recognized that group sessions could not be held one Friday "due to DOC issues" regarding the lack of available handcuffs. Id. at PLAINTIFFS000901.

- Thompson recognized that despite requests made directly to the DOC about locking in patients who exhibit threatening and aggressive behavior, DOC personnel do not promptly lock in said patients. Id. at PLAINTIFFS001102.

- By email dated June 14, 2013, Thompson lamented over the lack of control over inmates and the "unsafe environment," hoping that a recent incident would lead to "some very needed changes on DOC's part." Id. at PLAINTIFFS001152.

- Unneland recognized that inmate placement was within the purview of the DOC, noting that the DOC was not "on top of security issues." Id. ¶ 126 at PLAINTIFFS001277-78.

- Unneland explained that the DOC was resistant to locking up violent, aggressive inmates and stated that "it seems there is a tolerance in DOC for many things which seem to defy logic." Id. at PLAINTIFFS001323.

There is no genuine dispute, therefore, that any remedial measure involving inmate discipline, inmate transfers, safety equipment, and facility changes were exclusively within the purview and control of the DOC, not Corizon. As a result, requiring Corizon to implement these remedial measures, which were outside of its control, hardly constitutes "reasonable" remediation efforts. Accordingly, Corizon's inability to implement the vast majority of remedial measures requested by Plaintiffs cannot serve as a basis for NYCHRL liability.

**B.    Notwithstanding Corizon's Lack of Control, Corizon Took Significant Steps to Address Violence and Sexually Inappropriate Conduct**

Given the lack of control Corizon had over the inmates and facility, the preventative and remedial measures Corizon employed necessarily required the cooperation and involvement of the DOC, DOHMH, and the City of New York. These measures included implementing several

9

policies governing violence and sexual harassment, repeatedly meeting with and pressuring the DOC to preemptively address issues, repeatedly contacting the DOC to address specific complaints raised by Plaintiffs, and implementing several remedial measures approved by OSHA.  Under no circumstances can this level of action by Corizon be deemed "acquiescence" of violence and sexually inappropriate behavior, nor can it support a finding that Corizon failed to act reasonably diligently in addressing these issues.  Plaintiffs recognize that the issues complained of cannot be completely remediated in a jail setting, and they cannot dispute that the DOC, DOHMH, and the City of New York remained a bottleneck in Corizon's remedial efforts.

Where an employer takes prompt remedial or preventative measures to address complaints of discrimination, summary judgment is appropriate.  See Springs v. City of N.Y., 2019 U.S. Dist. LEXIS 55094, at *43-44 (S.D.N.Y. Mar. 29, 2019) (granting summary judgment on NYCHRL claim where plaintiff did not raise a material issue of fact as to whether defendant failed to take corrective action); Sanderson-Burgess v. City of N.Y., 173 A.D.3d 1233, 1235 (1st Dep't 2019) (affirming summary judgment on NYCHRL claim where employer took prompt remedial action and plaintiff failed to raise triable issue of fact); Clark v. Morelli Ratner PC, 73 A.D.3d 591, 592 (1st Dep't 2010) (affirming summary judgment on NYCHRL claim where plaintiff did not establish that defendant did not take remedial action); Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp. 2d 275, 286 (S.D.N.Y. 2006) (granting summary judgment on NYCHRL claim where plaintiff failed to demonstrate that her employer failed to take remedial action).

At the outset, Corizon had in place several policies, training programs, and general preventative measures designed to address the issue of sexual harassment and violence[4] in the

---

[4] Although general acts of violence in the jail are not actionable as "sexual harassment," because Plaintiffs purport to base their sexual harassment claims largely on safety issues, Corizon identifies for the

jail. These included: written policies prohibiting any form of discrimination, id. ¶ 24; a hotline where employees can make anonymous complaints, id. ¶ 44; a zero-tolerance policy prohibiting any form of sexual harassment, id. ¶ 24; a mandated yearly sexual harassment training program, id. ¶ 26; orientation modules concerning sexual harassment, id. ¶ 25; a Workplace Violence Prevention Program, id. ¶ 29; Situation Awareness training with the DOC, id. ¶ 47; an incident reporting system establishing a procedure by which any employee feeling threatened in the workplace can submit a report to their supervisor or management, id. ¶ 31; the establishment of Island-wide and facility-based safety committees and a risk management committee dedicated to ensuring a safe workplace for employees, id. ¶ 35; an aggressive patient alert system, id. ¶ 38; the implementation of a safety and security suggestion box, id. ¶ 42; and comprehensive and meticulous incident reporting logs detailing the types of incidents that occurred in the jail, id. ¶ 49.

Although Corizon's implementation of these measures more than adequately establishes that it did not "acquiesce" or fail to take "reasonable" remedial efforts to address Plaintiffs' complaints, Corizon went further by repeatedly pressuring the DOC to take action beyond Corizon's control.

Generally, whenever Corizon was made aware of any potential issues in the jail, Corizon proactively contacted the DOC to preemptively address these issues. This is particularly true of all complaints received by Andiea Harris, the mental health deputy director at Corizon. Dr. Harris promptly informed the DOHMH and the DOC whenever she was made aware of a safety

---

Court the remedial and preventative measures it employed as to both sexual harassment and violence. However, it remains Corizon's position that conduct that made the Plaintiffs feel unsafe is not synonymous with sexual harassment and not actionable under anti-discrimination laws.

issue, id. ¶ 19, which included Plaintiffs' complaints regarding lack of handcuffs, id. ¶ 113, inmates throwing feces at staff, id. ¶ 120, and other matters.

The record is rife of examples demonstrating Corizon's proactivity.  For example, in April 2013, clinical supervisor Beth LaGrange contacted Warden Luis Rivera about addressing an issue concerning the lack of available handcuffs, which interfered with group sessions.  After not hearing back from the Warden, Ms. LaGrange contacted Dr. Harris, who stated that she will address the issue at an upcoming meeting.  Id. ¶ 80 at PLAINTIFFS000906, 914-15.  Corizon also held weekly meetings with the DOC to discuss placement and transfer of aggressive and dangerous patients.  Id. ¶ 48.  On December 2, 2014, Dr. Igor Davidson from Corizon reached out to the DOHMH to address safety issues concerning the placement of a particular patient and was informed that the DOC would address the issue.  Id. ¶¶ 18-19.  In May 2014, Corizon rolled out a system of daily emails that would provide a list of assaultive patients to leadership and, with DOC input, began moving office furniture to better protect staff during encounters.  Id. ¶ 28.

### 1.    Specific Remediation Efforts Related to Thompson's Complaints

Not only did Corizon take general proactive steps to minimize risk in the jail, it also promptly responded to specific issues raised by Plaintiffs.  With respect to Thompson's limited complaints of alleged sexually inappropriate inmate behavior, after she reported the sexual inappropriateness of one inmate to Corizon, Ms. Minervini immediately contacted the DOC so that it may intervene.  Id. ¶ 124.  On October 10, 2015, Thompson complained about an inmate who was masturbating and requested that he be transferred.  Id. ¶ 121.  Thompson admitted at her deposition that the DOC was responsible for effectuating the transfer and that she believes the inmate was transferred.  Id. ¶¶ 122-23.

As for Thompson's complaints unrelated to sexual harassment, notwithstanding that they are not actionable, these too were addressed. On October 14, 2013, when another clinician reported that there was a possible threat to Thompson's safety, Corizon determined it would be best to transfer Thompson and requested that the DOC investigate. Id. ¶ 115. In addition, Dr. Leibowitz requested a meeting with the DOHMH and DOC to discuss "significant" changes to improve staff safety. Id. On November 5, 2013, when Thompson complained that she did not feel comfortable conducting her rounds given the lack of handcuffs, Dr. Romano responded one minute later and told Thompson not to take any chances and to do what makes her feel comfortable. Id. ¶¶ 109-10. On November 20, 2014, Dr. Neil Leibowitz contacted the DOC to request assistance in ensuring that a potentially dangerous patient was prevented from having contact with Thompson and followed up with Thompson to see if she wanted to discuss further. Id. ¶ 116. A couple of hours later, the DOC transferred the inmate. Id. ¶ 117. After Thompson expressed concern over her safety with respect to another violent inmate, Corizon contacted HHC, and the DOC agreed to move the inmate out of the unit. Id. ¶¶ 118-19.

Any suggestion, therefore, that Corizon simply allowed offending or dangerous conduct to take place, whether legally actionable or not, is easily refuted by the record before the Court.

### 2.      Specific Remediation Efforts Related to Unneland's Complaints

With respect to Unneland's sole written complaint of sexually inappropriate inmate behavior, regarding an inmate that exposed his genitals to her, Corizon advised Unneland, that same day, to file a complaint or have the Unit Chief do so on her behalf. Unneland was also told that she should feel free to leave the unit at any time she feels unsafe. Id. ¶ 129. As for verbal complaints, after an inmate exposed himself to Unneland, the inmate was transferred with assistance from the DOC. Id. ¶ 130. In short, Unneland's entire discrimination claim within the

limitations period is based on nothing more than these isolated incidents, which were promptly addressed.

The overwhelming majority of Unneland's complaints were safety focused and had nothing to do with discrimination.  The record makes clear that Corizon, nonetheless, addressed these concerns too.  Unneland acknowledged that a new "aggressive patient alert" system implemented by Corizon "is a very helpful feature," but noted problems with DOC personnel who leave civilians alone on a housing unit that needed to be addressed by DOC supervisors.  Corizon explained that it is doing everything in its power to bring these incidents to the attention of high-ranking DOC officials.  Id. ¶ 127 at PLAINTIFFS001233-34.  On April 22, 2014, after Unneland complained that the DOC failed to intervene in an incident where a staff member was assaulted by an inmate, Corizon confirmed that both the tour commander and the warden were made aware.  Id. at CCDefs_E_0000064-66.  On April 22, 2014, Unneland complained that an inmate exposed himself to her.  Corizon responded that same day advising that the treatment of this inmate would be discussed the next day and to keep informing Corizon of any safety concerns.  Id. ¶ 128 at PLAINTIFFS001414.

### 3.  Specific Remediation Efforts Related to Medich's Complaints

With respect to Medich, the only written complaint involving alleged sexually inappropriate behavior concerned an inmate that touched her right hip.[5]  Id. ¶¶ 131, 133.  The same day Corizon was made aware, it instructed Medich on how to report the incident and provided her with all the information she requested.  Id. ¶ 132.  The DOC infracted the inmate and moved the inmate.  Id. ¶ 134.  The inmate was also charged with a crime and convicted.  Id.

---

[5] It is Corizon's position that this incident amounts to nothing more than a petty slight or trivial inconvenience such that it is not actionable under the NYCHRL.  Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 80 (1st Dep't 2009).

¶ 135.  Corizon's Health Services Administrator for the AMKC also alerted staff of the incident to make them aware of what Corizon was doing to address the issue.  Id. ¶ 137.

Other than this written complaint, Medich testified as to just a single verbal complaint regarding a group of inmates that engaged in sexually inappropriate conduct directed at a group of mental health staff.  Id. ¶¶ 138-39.  Corizon informed Medich that the complaint would be addressed at a weekly meeting, and Medich testified that Dr. Harris promptly addressed the issue by stating that Corizon needs a zero-tolerance policy regarding this behavior.  Id.

### 4.  Specific Remediation Efforts Related to Dechoudens' Complaints

Lastly, with respect to Dechoudens, on February 11, 2014, after she was splashed by an unknown substance by an inmate, the DOC intervened, and Corizon filed the required DOHMH incident report.[6]  Id. ¶ 140.  On March 4, 2014, Corizon offered to transfer Dechoudens to another facility after an alleged safety incident, which she refused.  Id. ¶¶ 146-47.  On March 10, 2014, Corizon explained that it was putting "tremendous pressure on DOC to improve safety" and encouraged Dechoudens to volunteer on one of the safety committees.  Id. ¶ 148.  On April 22, 2014, after Dechoudens expressed safety concerns, Corizon again offered to transfer her to another area where she would feel safer, but Dechoudens again refused.  Id. ¶¶ 149-50.

The above summary of remedial and preventative efforts as to all Plaintiffs is far from exhaustive.  To recount every email, meeting, and measure taken to address the complicated issues of threatened violence and sexually inappropriate behavior at Rikers Island would require significantly more pages of briefing and exhibits.  This summary highlights for the Court the realities of the jail environment, which must be taken into consideration when analyzing

---

[6] Although Dechoudens' claims are time barred in their entirety, Corizon addresses the substance of her claims to demonstrate to the Court that Corizon certainly did not acquiesce or fail to address the complained-of conduct.

Plaintiffs' NYCHRL claim.  The inescapable reality is that the complained-of acts by the inmates cannot be completely remediated, which Plaintiffs themselves recognize and so should this Court.  Id. ¶ 50.

In the end, it is not Corizon's burden to establish that violence and sexually inappropriate by inmates were eradicated on its watch while it was performing services at Rikers Island. Plaintiffs bear the burden of demonstrating that Corizon acquiesced or failed to exercise reasonable diligence in addressing sexual harassment.  Mavis Disc. Tire, 2013 U.S. Dist. LEXIS 141038, at *16-17; Curto, 26 A.D.3d at 809.  On the record before the Court, no jury can conclude that Corizon acquiesced or failed to exercise reasonable diligence.  There is a limit to the remedial measures Corizon could implement at Rikers Island, and based on the foregoing, there is no genuine dispute that Corizon did more than enough under the law to address inappropriate conduct by inmates outside of its control to be entitled to summary judgment on Plaintiffs' NYCHRL discrimination claim.

## C.   **Plaintiffs' Complaints Do Not Concern Sex Discrimination**

Plaintiffs' sex discrimination claim fails for another reason:  the complained-of conduct does not amount to "sexual harassment" or "sex discrimination."  The overwhelming majority of Plaintiffs' complaints concern general threats of violence and safety issues in the jail, which affected ***all*** staff members -- men and women.[7]  The remaining complaints, which focus predominately on inmate masturbation and exposure, also fail to constitute sexual harassment because these acts were committed by inmates housed in units specifically designated for inmates with severe mental illness.  Behavior by mentally ill patients that must be addressed

---

[7] Considering this was a jail setting and involved mentally ill inmates, the same was true for the alleged sexually inappropriate inmate conduct.  SMF ¶¶ 84-86.

clinically cannot also give rise to sexual harassment claims, especially since the inmates engaged in this behavior regardless of whether the treatment provider was a male or female.

**1.    Plaintiffs' Allegations Concerning Violence Cannot Support a Sexual Harassment Claim**

To establish a sexual harassment discrimination claim under the NYCHRL, a plaintiff must demonstrate that "she has been treated less well than other employees because of her gender -- i.e., that she has been subjected to differential treatment."  Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 657 (E.D.N.Y 2015) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013)).  A plaintiff's subjective belief as to the hostile or abusive nature of the environment is insufficient; to be actionable, a reasonable person must also find the environment hostile and abusive and the conduct creating such an environment must have been because of the plaintiff's sex.  See Fattoruso v. Hilton Grand Vacations Co., LLC, 873 F. Supp. 2d 569, 578 (S.D.N.Y. 2012) (under NYCHRL, sexual harassment must result in unequal treatment based upon a protected class); Magnoni v. Smith & Laquercia, LLP, 701 F. Supp. 2d 497 (S.D.N.Y. 2010) (finding plaintiff did not prove sexual harassment after taking into account her "close, friendly" relationship with the alleged harasser and that a reasonable person would not have considered defendant's conduct to be sexual harassment), aff'd, 483 Fed. App'x 613 (2d Cir. 2012).

Thus, general acts of violence or fear of violence not based upon Plaintiffs' status as women are insufficient to constitute sexual harassment.  See Fattoruso, 873 F. Supp. 2d 578-79 (where "everyone" in workplace took "umbrage" at complained-of conduct, NYCHRL sexual harassment claim failed because conduct was not hostile to specific sex); Rogers v. Bank of N.Y. Mellon, 2016 U.S. Dist. LEXIS 107780, at *57 (S.D.N.Y. Aug. 15, 2016) (granting summary

judgment on NYCHRL claim where "plaintiff has failed to create an issue of fact as to whether she was subjected to harassment due to her race or gender").

Moreover, the NYCHRL does not operate as a "general civility code." Thelwell v. City of N.Y., 2015 U.S. Dist. LEXIS 98406, at *29 (S.D.N.Y. July 28, 2015), aff'd, 733 Fed. App'x 561 (2d Cir. 2018).  Thus, no liability may be imposed where the complained of conduct amounts to "petty slights and trivial inconveniences." Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 80 (1st Dep't 2009); Wilson v. N.Y.P. Holdings, Inc., 2009 U.S. Dist. LEXIS 28876, at *85-89 (S.D.N.Y. Mar. 31, 2009) (finding references to female employees as "whores" and "sluts" and comments that training females was like "training dogs" amounted to no more than petty slights and trivial inconveniences), aff'd, Watson v. N.Y. Pressman's Union No. 2, NYP Holdings Inc., 444 Fed. App'x 500 (2011).

Plaintiffs cannot maintain a sexual harassment claim against Corizon based on their belief that Corizon failed to adequately address safety conditions and threats of violence in the jail because these complaints are completely untethered to Plaintiffs' sex.  The record establishes that the general safety concerns at Rikers affected men and women, Corizon staff, DOC staff, and even the inmates themselves.  See e.g., SMF ¶ 81 at PLAINTIFFS001286-88 (email chain discussing slashing of male inmate, assault on two corrections officers, and inmate smashing his head against Plexiglas to intimidate male MHC); PLAINTIFFS001305 (assault on male MHC); PLAINTIFFS001434 (slashing of male inmate); PLAINTIFFS001497 (another male MHC assaulted by one of his patients); PLAINTIFFS001548 (inmate attack on officer); PLAINTIFFS000831 (inmate specifically did not target Thompson while he was throwing cinderblocks at officers).  Deputy Warden Gallagher also testified that inmates threatened

everyone, including himself, and that such threats were unfortunately common given the violent disposition of several of the inmates.  Id. ¶ 82.

Absent from the record is a shred of evidence linking the general safety and violence concerns to sex.  Summary judgment in favor of Corizon, therefore, should be granted to the extent Plaintiffs intend to rely on general safety concerns to support their sexual harassment claim.

### 2.    The Remainder of Plaintiffs' Allegations Concern the Treatment of Inmates with Severe Mental Illnesses and Cannot Serve as a Basis to Maintain a Sexual Harassment Claim

Although Plaintiffs seemingly attempt to divorce the inherent dangerousness of working in a jail environment from their sexual harassment claims, well-established law demonstrates that the nature of the work environment is a key consideration in analyzing such claims.  See Ladepo v. United Cerebral Palsy of N.Y.C., Inc., 2018 U.S. Dist. LEXIS 155793, *35 (S.D.N.Y. Sept. 12, 2018) (under NYCHRL, considering "the totality of the circumstances" and "overall context in which the challenged conduct occurs"); see also Daniel v. Cal. Dep't of Corr. & Rehab., 2013 U.S. Dist. LEXIS 181441, *18 (E.D. Cal. Dec. 26, 2013) ("[T]he fact remains that whether or not a sexually charged atmosphere created by inmate behavior is sufficiently severe and pervasive must necessarily be viewed in the context of a prison environment itself.  It would appear axiomatic that what amounts to severe and pervasive misconduct in a correctional setting is wholly different than what would be reasonably expected within the confines of, for example, a law office.").

In Vajdl v. Mesabi Academy of KidsPeace, Inc., 484 F.3d 546, 549 (8th Cir. 2007), plaintiff worked for an organization that provided residential care to young male sex offenders and while working with these youths, experienced "physical threats and sexual comments" from

19

them. Distinguishing the conduct of her co-workers from the conduct of the young offenders she was employed to work with, the court explained that "[t]he operation and atmosphere" of institutions that house dangerous and violent criminal offenders "differ substantially from typical work environments," warranting "specialized legal analysis." Id. at 550. "Prisoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior." Id. (quoting Slayton v. Ohio Dep't of Youth Servs., 206 F.3d 669, 677 (6th Cir. 2000)). The Court held that the employer could not be held liable for the conduct of the inmates. Id. at 550-51.

Here, the Court must reject outright any attempt by Plaintiffs to dissociate the atmosphere of a jail environment housing inmates with severe mental health issues from the sexual harassment analysis. Indeed, by choosing to work in a jail as MHCs responsible for treating the severe mental health issues of inmates, Plaintiffs necessarily acknowledged and accepted the probability that they will be faced with inappropriate behavior. It is an inescapable part of the job.

At the outset, Medich, Dechoudens, and Unneland raised very few complaints of alleged sexually inappropriate inmate behavior. As discussed above, Medich and Unneland only raised one written complaint each, and both were promptly addressed. Dechoudens' limited written complaints were also promptly addressed. Plaintiffs' testimony similarly revealed that their limited verbal complaints were also addressed. Simply put, this is not a case where Plaintiffs were routinely subject to sexually inappropriate inmate behavior. With respect to Thompson, although she arguably raised more complaints, there is nothing to suggest that Corizon acquiesced or failed to take reasonable corrective action within its control.

Given that Plaintiffs were tasked with treating inmates with severe mental health issues, the few reported incidents of sexually inappropriate behavior exhibited by these patients was often a manifestation of the mental illness itself such that it may be treated clinically and was not "sexual harassment." See SMF ¶¶ 87. In fact, the majority of Plaintiffs' "complaints" concerning sexually inappropriate conduct were admittedly reports regarding patient care issues and not complaints of "sexual harassment." Id. at ECF No. 1 ¶ 23 (Thompson was "mandated" to send daily emails to clinical supervisors "reporting all clients' behavioral incidents that happened on that day"); Thompson Tr. 150:23-151:6 (admitting that one of her responsibilities as a MHC was to counsel inmates not to engage in sexually inappropriate conduct); Unneland Tr. 401:3-11 (reporting sexually inappropriate behavior to supervisors for purposes of obtaining proper patient care and not reporting it as an incident of sexual harassment); Medich Tr. 112:13-21 (acknowledging that it is reasonable to expect some inmates and patients to "act out in a sexual way for different reasons").

In some cases, a disciplinary rather than clinical approach was applied through the DOC to address inappropriate inmate behavior. Id. ¶ 88 at Thompson Tr. 189:5-191:17 (Corizon supervisor agreed that inmate should be infracted and not be permitted to participate in group therapy); CCDefs_E_0001526 (inmate disciplined by DOC on same day as Medich's complaint).

Under these circumstances, therefore, Corizon cannot be held liable for sexually inappropriate behavior from inmates with severe mental health issues that Plaintiffs were required to treat. To hold Corizon liable would be to effectively ignore the realities of the jail environment and the mental health issues largely responsible for the offending behavior.

For these reasons, Corizon is entitled to summary judgment on Plaintiffs' NYCHRL sex discrimination claim.

## POINT III

## PLAINTIFFS' RETALIATION CLAIMS FAIL AS A MATTER OF LAW

Thompson and Medich are the only Plaintiffs who allege retaliation claims under the NYCHRL.[8]  According to Thompson and Medich, they were retaliated against after allegedly reporting incidents of inappropriate inmate behavior.  Plaintiffs, however, cannot establish a prima facie case of retaliation as set forth below.  Moreover, Corizon had legitimate, non-retaliatory reasons for its employment decisions, which Plaintiffs cannot show are pretextual.  As such, summary judgment is appropriate.

NYCHRL retaliation claims are examined under a three-step burden-shifting analysis. See Blanc v. Sagem Morpo, Inc., 394 F. App'x 808, 809 (2d Cir. 2010) (explaining same Title VII framework applies to retaliation claims brought under NYCHRL); see also Sarr v. Saks Fifth Ave. LLC, 2016 N.Y. Slip Op. 31751[U], *2 (Sup. Ct. 2016) (stating NYCHRL claims "must be evaluated under a burden-shifting analysis").  To prevail on a NYCHRL retaliation claim, Plaintiffs must first set forth a prima facie case showing (1) they participated in a protected activity known to Corizon; (2) Corizon took an adverse action against Plaintiffs; and (3) a causal connection exists between the protected activity and the adverse action.  See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2013); see also Cadet-Legros v. N.Y. Univ. Hosp. Ctr., 135 A.D.3d 196 (1st Dep't 2015).

Generally, an employer's conduct need not be materially adverse to be actionable "so long as 'the retaliatory or discriminatory act [was] reasonably likely to deter a person from engaging in protected activity.'"  Brightman v. Prison Health Serv., Inc., 108 A.D.3d 739, 739-

---

[8]  Although Unneland has not pled a claim of retaliation and alleges no facts in support of a retaliation claim, she testified that she was in fact asserting a retaliation claim.  It is clear from her deposition testimony, however, that her retaliation claim is not directed at Corizon.  SMF ¶ 98.

40 (2nd Dep't 2013) (quoting N.Y.C. Admin. Code § 8-107(7)). Nonetheless, an inability to demonstrate a causal link between the retaliatory conduct and the protected activity is fatal to a NYCHRL retaliation claim. Mooney v. City of N.Y., 2019 U.S. Dist. LEXIS 157262 (S.D.N.Y. Sept. 13, 2019) (granting summary judgment on NYCHRL retaliation claim where plaintiff failed to present evidence to establish connection between the protected activity and alleged adverse action). See also Mohamed v. N.Y. Univ., 2015 U.S. Dist. LEXIS 68164, at *56 (S.D.N.Y. May 21, 2015) (noting that aside from not requiring a materially adverse action, "a prima facie case of retaliation faces the same requirements under NYCHRL as under the NYSHRL" and Title VII (quoting Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012))).

Even if plaintiffs establish a prima facie case for retaliation, the employer may rebut same by proffering that it had a legitimate, non-retaliatory reason for its alleged adverse action. Brightman, 108 A.D.3d at 740. Where plaintiffs cannot produce evidence that the reasons set forth are pretextual, as is the case here, summary judgment is appropriate. See id. (explaining a "plaintiff must submit evidentiary facts or materials to rebut the defendant's prima facie showing, so as to demonstrate the existence of a triable issue of fact").

## A. Plaintiffs Did Not Engage in the Type of Protected Activity That Would Have Made Corizon Aware of the Discriminatory Nature of Their Objections

To satisfy the first element of Plaintiffs' prima facie burden, the alleged protected activity must involve a complaint or opposition to discriminatory conduct prohibited by the NYCHRL. See Brook v. Overseas Media, Inc., 69 A.D.3d 444, 445 (1st Dep't 2010) (explaining protected activity refers to "opposing or complaining about unlawful discrimination"). Absent a complaint or opposition to unlawful discrimination, the retaliation claim fails. Brown v. City of N.Y., 2019

Slip Op. 30565[U], *17 (Sup. Ct. 2019) (citing Fruchtman v. City of N.Y., 129 A.D.3d 500, 501 (1st Dep't 2015)). "Filing a grievance complaining of conduct other than unlawful discrimination . . . is simply not a protected activity subject to a retaliation claim under the [NYSHRL or NYCHRL]." Mi-Kyung Cho v Young Bin Café, 42 F Supp. 3d 495, 507 (S.D.N.Y. 2013) (alterations in original) (citations and internal quotation marks omitted). Therefore, claims for retaliation are not viable where there was nothing in the plaintiffs' protests that could reasonably have led the employer to understand the discriminatory nature of their complaints.

According to Thompson, she was retaliated against after complaining about the inmates' inappropriate behavior, the lack of adequate security (particularly the lack of handcuffs to secure the inmates), her caseload, and how the unit was being run generally. SMF ¶ 89. As for Medich, she claims that she was retaliated against after complaining about safety issues and the inmates' inappropriate behavior. Id. ¶ 94. None of these objections, however, support an inference that the complaints were made in opposition to discriminatory conduct under the NYCHRL or caused Corizon know that the root of their complaints was in any way related to their gender. To the contrary, Plaintiffs' complaints solely raised safety issues surrounding the general conditions of jail operations and their interaction with the inmates, which fall outside the NYCHRL's purview. See Drumm v. S.U.N.Y. Geneseo College, 486 Fed. App'x 912, 914 (2d Cir. 2012) (dismissing retaliation claim because complaints amounted "only to general allegations of mistreatment" and not any indication that she was subjected to gender discrimination). Therefore, the complained-of conduct here, which involved general safety issues that pertained to all Corizon employees working in the jail -- male or female -- and not unlawful discrimination, is not a protected activity subject to NYCHRL as a matter of law. Mi-Kyung Cho, 42 F. Supp. 3d at 507.

Moreover, reports of alleged inmate misconduct made pursuant to the MHCs' official duties cannot constitute protected activity. Most of Plaintiffs' complaints about the inmates' inappropriate conduct were communicated by way of daily reports transmitted via email. ECF No. 1 ¶ 23. These reports were mandated from the MHCs, as part of an MHC's daily duties to report on the mental status of the inmate receiving mental health care and gauge their progress. Id. ¶ 51. The purpose of these reports, therefore, was not to oppose what the MHCs believed was discriminatory behavior but to instead fulfill their duty to inform their supervisors of the inmates' treatment. Id. at Thompson Tr. 152:10-17.

As a result, evidence of daily reports and emails concerning disruptive inmate behavior -- not based on the gender of the Plaintiffs -- simply cannot support a finding that Plaintiffs engaged in protected activity because they "never asserted to anyone that [they] suffered from this mistreatment, as a result of a protected characteristic." See Brown, 2019 N.Y. Slip Op. 30565[U], at *17. Indeed, these general complaints never indicated that it was a communication in direct opposition to discriminatory behavior. See Talwar v. Staten Island Univ. Hosp., 610 F. App'x 28, 30 (2d Cir. 2015) (concluding prima facie case not met because plaintiff failed to establish that her employer was "on notice" that her complaints were about gender discrimination and "not just general unsatisfactory or unfair conduct").

Accordingly, Plaintiffs did not engage in the type of protected activity that would made Corizon aware that they were complaining about discriminatory conduct and summary judgment in favor of Corizon should be granted.

**B.      Plaintiffs Provide No Evidence that Corizon Engaged in Retaliatory Conduct**

Plaintiffs also fail to demonstrate that Corizon "engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112; see also

Mooney, 2019 U.S. Dist. LEXIS 157262, at *24-25 (finding denial of request for leave not reasonably likely to deter others from taking action opposing discrimination).   Evidence demonstrating likelihood of deterrence, without more, is insufficient to defeat summary judgment.   Plaintiffs must also point to facts that the actions taken disadvantaged them.   See Taylor v. City of N.Y., 207 F. Supp. 3d 293, 308 (S.D.N.Y. 2016) (dismissing retaliation claim because plaintiff did not demonstrate her transfer disadvantaged her) (citing Fletcher v. Dakota, Inc., 99 A.D.3d 43, 51-52 (1st Dep't 2012)); Chin v. N.Y. City Hous. Auth., 106 A.D.3d 443, 444 (1st Dep't 2013) (finding that being yelled at, overworked, excessively scrutinized and required to perform undesirable tasks did not disadvantage plaintiff such that an actionable employment action has occurred for purposes of NYCHRL retaliation claim).

Even assuming Plaintiffs engaged in protected activity -- which they did not -- they cannot show that any action taken by Corizon would reasonably deter others from engaging in protected activity, let alone that they were personally disadvantaged.   Thompson alleges she was retaliated against by being micromanaged; being required to "account for each second of [her] day"; denied "mutual assignments," i.e. the opportunity to switch shifts/assignments with other MHCs; and written up for being late.   SMF ¶ 90.   None of these actions, however, disadvantaged Thompson.   See Taylor, 207 F. Supp. 3d at 308-09 (dismissing retaliation claims were plaintiff did not plead any facts to infer she was disadvantaged by employer's action).

First, allegations of micromanagement are insufficient to demonstrate retaliatory conduct. See Augustine v. Cornell Univ., 2018 U.S. Dist. LEXIS 49779, at *43 (S.D.N.Y. Mar. 26, 2018) (finding allegations of retaliation based on alleged micromanagement "not sufficiently adverse actions to establish prima facie case under" NYCHRL), aff'd, Brown v. Cornell Univ., 758 Fed. App'x 226 (2019).

Second, Thompson's claim that she was retaliated against by Unit Chief Minervini is significantly undermined by the admitted fact that the complaint surrounded her workload -- not inmate behavior.  SMF ¶ 89 at ECF No. 1 ¶ 29; Thompson Tr. 258-6 to 21.  Moreover, any denial of "mutual assignments" cannot be retaliatory because it did not require Thompson to work more or less, it only required her to work her ordinary shift.  See Mooney, 2019 U.S. Dist. LEXIS 157262, at *22-25 (finding that being asked to "work when one is scheduled to work would not dissuade a reasonable worker from engaging in protected activity" and granting summary judgment on NYCHRL claim).

Lastly, write-ups for being late do not suggest others would be dissuaded from engaging in oppositional activity particularly where, as here, the employee was in fact late.  Simply put, Thompson fails to point to any facts that she was retaliated against for complaining about the inmates' inappropriate conduct or disadvantaged as a result of these actions.

Medich's retaliation claim similarly fails as a matter of law.  According to Medich, she was retaliated against when her "support group" was dissolved, she was assigned to "the most dangerous patients and units," her request to transfer was denied, and she was excessively criticized for her work.  ECF No. 1 ¶¶ 73-76.  None of these actions rise to the level of either disadvantaging Medich or causing others to refrain from engaging in protective activity.

For starters, such support groups were strictly prohibited by Corizon's contract with the City and Medich was so informed.  SMF ¶ 7.  Moreover, the lack of a formal support group at no time prevented Medich from making complaints about the inmates' behavior or discussing these issues with her supervisors and other MHCs.  Hence, there is no indication that the lack of the group disadvantaged Medich or would lead others from not voicing their concerns.

With respect to Medich's request to transfer, the undisputed evidence shows that her request was not "denied"; instead, Medich was told to follow the transfer request procedure, which she never did.[9]  Id. ¶ 96.  Thus, any argument that Corizon's action would have a chilling effect on others is unsupported because all she was told to do is follow the procedure all employees are required to follow.  See Taylor, 207 F. Supp. at 308-09 (dismissing claim that failure to transfer was retaliation).  Although it may have been Medich's preference to work with less "dangerous" inmates, Medich's core function as a MHC included treating inmates whose mental illnesses fell on a wide spectrum of severity.  In fact, Medich admits that she was more senior to others, hence possessing more experience and capability to treat inmates with more severe mental health problems.  See SMF ¶ 96 at Medich Tr. 179:4-6.  Medich, therefore, fails to demonstrate how placement in a unit with whom she considers "more dangerous" inmates in any way disadvantaged her.   See Chin, 106 A.D.3d at 444 (being given undesirable tasks not sufficient to meet standard).

Finally, the criticism Medich received from her supervisors is similarly not actionable. Here, Medich alleges that she was criticized when she entered "cancelled" as opposed to "seen" in her medical notes when no treatment was provided to the inmate.  ECF No. 1 ¶ 76.  This correction, however was part of her responsibility as a MHC in maintaining the inmates' medical chart, and is key in keeping accurate records and notes on the inmates' progression.  See Batchelor v. City of N.Y., 2014 U.S. Dist. LEXIS 46921, at *164-166 (E.D.N.Y. Feb. 16, 2014) (finding overscrutiny and criticism did not meet NYCHRL retaliation definition because "all of the scrutiny and criticism . . . related to her actual job responsibilities").  Thus, there is no disadvantage to Medich in receiving this required correction to maintaining an inmates' medical

---

[9] All MHCs including Ms. Medich, were members of the 1199 Union, and the Collective Bargaining Agreement dictated the procedure for seeking a transfer.

chart, which "improves her job performance and [Corizon's] realization of its mission." Id. at *167.

For the foregoing reasons, Plaintiffs have not demonstrated that Corizon engaged in retaliatory conduct and that any actions taken by Corizon disadvantaged them or caused a chilling effect upon others, thus, summary judgment is appropriate.

## C. Plaintiffs Provide No Evidence of any Causal Connection Between Complaints and any Alleged Retaliatory Conduct

Plaintiffs' claim for retaliation also fails because they cannot establish a causal connection between their complaints and the alleged retaliatory conduct and cannot even establish any evidence of temporal proximity. To begin, "evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL." Forrester v. Corizon Health, Inc., 752 Fed. App'x 64, 66 (2d Cir. 2018). Rather, plaintiffs must offer evidence that retaliation was "at least a partial motivating factor." Id.; see also Villar v. City of N.Y., 135 F. Supp. 3d 105, 139 (S.D.N.Y. 2015) ("[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives . . . ." (alteration in original) (quoting Mihalik, 715 F.3d at 112)); Mooney, 2019 U.S. Dist. LEXIS 157262, at *25 (finding plaintiff failed to present evidence sufficient to infer a causal connection). Consequently, summary judgment is appropriate when "retaliation 'play[ed] no role' in defendant's actions." Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 75, 76 (2d Cir. 2015).

Here, Thompson and Medich blankly assert that they were retaliated against after complaining about and reporting incidents of sexual harassment without even demonstrating temporal proximity. See Gaughan v. Rubenstein, 261 F. Supp. 3d 390, 418-19 (S.D.N.Y. 2017) (concluding facts insufficient to establish a causal connection because plaintiff was "silent as to when" complaints were made and alleged retaliatory acts took place). Medich alleges she first

began complaining about the inmates' inappropriate conduct in late November 2008. ECF No. 1 ¶ 58. As a result, Medich submits that her support group was disbanded the following year, in 2009, offering no additional information or specific date that would allow the Court infer a causal link. Notably, Medich alleges she was again retaliated against in 2013 and February 2016 without attributing the alleged retaliatory behavior to any of her complaints. ECF No. 1 ¶ 74. In fact, the only complaint made prior to 2013 was made in June 2010, more than two years after the alleged retaliation. Evidence of temporal proximity, therefore, is entirely lacking to support Medich's retaliation claim. Thompson similarly submits only conclusory statements that she was retaliated against after complaining without any evidence of a causal connection or temporal proximity. In light of these facts, Plaintiffs cannot establish a causal connection between their complaints and alleged employment actions. For this reason, summary judgment is appropriate.

Notwithstanding the lack of temporal proximity, even if the alleged retaliatory actions occurred shortly after voicing their complaints -- which they did not -- there is no evidence to infer that retaliation was the motivating factor behind Corizon's employment actions. See Dixon v Int'l Fed'n of Accountants, 416 F. App'x 107, 110 (2d Cir. 2011) (holding plaintiff's NYCHRL retaliation claim failed as a matter of law because plaintiff did not produce direct evidence to demonstrate causal connection between protected activity and alleged adverse action (emphasis added)). With respect to Thompson's allegations requiring an employee to arrive to work on time and supervising her performance to make sure she is working -- without any connection to any of her complaints -- is simply not enough to establish a retaliation claim. Medich's complaints are equally inadequate to establish causal connection because Corizon's action in disbanding the support group, asking her to keep accurate medical charts, and following established procedure in seeking a transfer were undisputedly based on its contract with the City

and its internal procedures.  The record is devoid of any evidence to suggest that Thompson's or Medich's superiors were motivated by retaliation.  On this evidence, no jury could reasonably find that retaliation was a motive for Corizon's actions.  See Aiossa v. Bank of Am., N.A., 2012 U.S. Dist. LEXIS 135699, at *15-16 (E.D.N.Y. Sept. 21, 2012) (citing Bennett v. Verizon Wireless, 326 F. App'x 9, 10 (2d Cir. 2009)).  Plaintiffs' retaliation claims, therefore, fail as a matter of law because they are unable to establish a causal connection between their complaints and the alleged adverse actions.

### D.   Corizon Had Legitimate, Non-Retaliatory Reasons for its Actions Taken

Even assuming Plaintiffs establish a prima facie case, their NYCHRL retaliation claims fail because Corizon had legitimate reasons for its employment decisions.

Thompson alleges she was written up for being late and required to account for every second of the day in retaliation of her complaints of sexual harassment.  It is undisputed, however, that Thompson was, in fact, admittedly often late to work.  SMF ¶ 92.  In addition, Thompson was asked to account for her time so that an informed decision can be made about her workload.  Id. ¶ 93.  None of these decisions were made in retaliation, nor can Thompson point to any evidence suggesting to the contrary.  Rather, Corizon, as an employer, had non-retaliatory, legitimate reasons to require its employees to arrive timely at work and efficiently utilize time at work to perform the functions required under Corizon's contract with the City.

The decision to dissolve Medich's "support group" was also made because of a legitimate, non-retaliatory reason.  Pursuant to Corizon's contract with the DOHMH, it lacked authority to permit this type of service.  SMF ¶ 95.  As for Medich's allegation that Corizon refused to transfer her, as mentioned before, Medich failed to follow the proper procedure for making the request and was informed to do so; her request was not denied.  Id. ¶ 96.

Therefore, there is no genuine dispute that Corizon had legitimate, non-retaliatory reasons for taking these actions, which requires the Court to grant summary judgment in its favor. See Ahmed v. Am. Museum of Natural History, 2019 U.S. App. LEXIS 31499, at *2 (2d Cir. Oct. 21, 2019) (affirming summary judgment because employer presented "substantial evidence of legitimate, non-discriminatory reasons" for its adverse actions and plaintiff failed to demonstrate reasons were pretextual).

## POINT IV

## PLAINTIFFS' WAGE AND HOUR CLAIMS FAIL AS A MATTER OF LAW

Plaintiffs Thompson and Unneland allege that they were not properly compensated for work performed during their unpaid lunch break, resulting in 2.5 hours of unpaid work per week. Given that there is no dispute of material fact that Corizon had no actual or constructive knowledge of the alleged work performed because Plaintiffs never notified Corizon of same, summary judgment in favor of Corizon should be granted, dismissing plaintiffs' NYLL claims.

For Plaintiffs to prevail on their NYLL claim, they must establish that they performed the work for which they were not properly paid and Corizon, possessing actual or constructive notice of that work, failed to compensate them. See Kuebal v. Black & Decker Inc., 643 F.3d 352, 365 (2d Cir. 2011) (holding that, to prevail in wage claim, plaintiff must prove that employer had "actual or constructive knowledge that he was performing uncompensated work"); cf. Hinterberger v. Catholic Health Sys., 299 F.R.D. 22, 37 (W.D.N.Y. 2014). Plaintiffs fail to meet this requirement.

To the extent that there were instances that Plaintiffs worked through their lunch, there is no evidence that Corizon knew that they worked through lunch and failed to compensate them accordingly. Employees seeking to recover unpaid wages bear the burden of proving that they

performed work for which they were not properly compensated.  See Moon v. Kwon, 248 F. Supp. 2d 201, 219 (S.D.N.Y. 2002).  In this case, Plaintiffs fail to meet this burden as they cannot identify with specificity which and how many days they worked through lunch.  SMF ¶ 107.  Knowledge of this information is particularly important because, in order to prevail on an unpaid lunch claim, employees must demonstrate that the time was spent "predominantly for the benefit" of the employer and any intrusion on lunch was more than de minimis.  See Beecher v. TWC Admin. LLC, 2016 U.S. Dist. LEXIS 112617, at *21-24 (W.D.N.Y. Aug. 22, 2016) (granting summary judgment as to plaintiffs' uncompensated lunch time) (citing Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 64 (2d Cir. 1997)).

Most importantly, Plaintiffs never complained to or even notified Corizon -- or their union representatives -- that they were not being properly compensated for work allegedly performed through lunch.  Corizon mandates a thirty-minute lunch break in accordance with NYLL § 162(2), and pursuant to its policy, deducts 0.5 hours automatically from employees' time records as uncompensated lunch time, for a total of 37.5 hours per work week.  SMF ¶ 103.  Plaintiffs were also aware in order to be compensated for time worked beyond the 37.5 hours that they must submit a form.  Id. ¶¶ 104-05.  Thus, unless Plaintiffs directly notified Corizon that they did not take a lunch that day by submitting the form, it was impossible for Corizon to know whether Plaintiffs worked through lunch.  See Hinterberger, 299 F.R.D. at 36-37 (explaining employers utilizing an automatic deduction for lunch breaks "may legally shift the burden to their employees to cancel the automatic deduction if they work through an unpaid meal break" (quoting Wolman v. Catholic Health Sys. of Long Island, Inc., 853 F. Supp. 2d 290, 301 (2d Cir. 2013))).  Plaintiffs' failure to notify Corizon is fatal to their NYLL claim.  See Joza, 2010 U.S. Dist. LEXIS 94419, at *29 (recognizing that allowing employees to prevail otherwise

would lead employees "to manipulate the judicial process by deliberately filing inaccurate payroll records and waiting until the time of suit to confess their inaccuracy").

With respect to Plaintiff Thompson, she offers no evidence that she ever advised her superiors. Despite having an established process in place, which directed employees to submit forms to be paid for additional hours of work, Thompson never completed same and offers no reasonable explanation for this failure. SMF ¶ 105. See Joza v. WW JFK LLC, 2010 U.S. Dist. LEXIS 94419, at *24 (E.D.N.Y. Sept. 9, 2010) (underscoring that fatal flaw in plaintiff's proof was "her inability to establish that she was prevented physically, practically, or otherwise from reporting her supposedly unpaid overtime"). In fact, Thompson concedes that in the instances where she submitted a form for overtime pay, she was properly paid overtime. SMF ¶¶ 101, 106. The law recognizes that Corizon's payroll system for reporting and obtaining additional compensation is proper and works efficiently to make sure employees have a method to report working hours beyond their usual scheduled. See Joza, 2010 U.S. Dist. LEXIS 94419 at *30 n.8 (explaining employers are permitted to establish reasonable procedures for employees to report unpaid wages, and require employees to follow those procedures). The undisputed evidence establishes that Thompson failed to utilize this procedure or notify Corizon she worked additional hours.

Like Thompson, Unneland never notified Corizon or her union about working through lunch uncompensated. SMF ¶ 100. Accordingly to Unneland, she never reported it to management because it was "obvious." Id. at Unneland Tr. 307:16-19. However, Corizon did not have a designated lunch hour or even lunch location for Plaintiffs. Thus, the only way to determine whether Plaintiffs worked through lunch was for Plaintiffs to report same, which they admittedly did not do. Nor have Plaintiffs offered evidence that management ever witnessed

them working through lunch. Simply put, Unneland's conclusory statements that it was "obvious" is insufficient to meet her burden of proof that she in fact worked through lunch every single day.

Hence, because of Plaintiffs' "inability to establish the frequency and extent [of working through lunch] was not primarily due to unreasonable record keeping practices" by Corizon, but rather "because of a failure on the part of . . . plaintiffs to consistently record lunch breaks" or a lack thereof, Beecher, 2016 U.S Dist. LEXIS 112617, at *24-25, Plaintiffs bear the burden of adequately demonstrating that they worked through lunch, which they cannot in this case. See also Seever v. Carrols Corp., 528 F. Supp. 2d 159, 170 (W.D.N.Y. 2007) (dismissing overtime claims after finding that the alleged inaccuracies in payroll records were "solely due to the [employees'] deliberate failure to accurately report the time they worked").

Finally Thompson and Unneland failed to establish that they exhausted the administrative procedure of filing a grievance through their Union. Accordingly, Corizon is entitled to summary judgment, dismissing plaintiffs' NYLL claims.

**CONCLUSION**

For the foregoing reasons, Corizon respectfully requests that the Court grant its motion

for summary judgment in its entirety.

Respectfully submitted,

**SAIBER LLC**
*Attorneys for Defendant*
*Corizon Health, Inc.*


*/s Jennine DiSomma*
Jennine DiSomma (jdisomma@saiber.com)
Vincent C. Cirilli (vcirilli@saiber.com)
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
(973) 622-3333